760 N.W.2d 35 (2009)
277 Neb. 37
STATE of Nebraska, appellee,
v.
April ROGERS, appellant.
No. S-07-085.
Supreme Court of Nebraska.
January 30, 2009.
*42 Steven J. Lefler, of Lefler Law Office, Omaha, for appellant.
Jon Bruning, Attorney General, and George R. Love for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
April Rogers was convicted of intentional child abuse resulting in death, a class IB felony,[1] and sentenced to life imprisonment. The primary issue presented in this appeal is whether Rogers' admission to hurting Alex Tay should have been suppressed. The record shows that when Rogers was interrogated by sheriff's officers, she tried to assert her constitutional right to remain silent, but the officers ignored her and continued to interrogate her until she was pressured into confessing. This violated clearly established decisions of the U.S. Supreme Court, which we are bound to follow. Therefore, we find that Rogers' confession was procured in violation of her Fifth Amendment right against self-incrimination, and we reverse the conviction and remand the cause for a new trial.

BACKGROUND
Rogers was convicted after a bench trial held on a stipulated record. The evidence *43 presented at the trial showed that on Monday, December 5, 2005, Rogers was babysitting in her home for 6-month-old Alex, as well as seven other children under the age of four. Lionel Tay, Alex's father, left Alex and his brother in Rogers' care at approximately 7:30 a.m. When Alex was dropped off, he appeared healthy and had no unusual symptoms. With the exception of an ongoing acid reflux problem, Alex had no significant medical history.
Around 10 a.m., Rogers called Lionel at work. Lionel could hear gasping sounds in the background as Rogers told him she was sorry, but that she had gone upstairs to make cereal for another child and that when she returned, she observed an 18-month-old child sitting on Alex's neck. Lionel rushed to Rogers' house.
When Lionel arrived approximately 12 minutes later, Rogers again told him, "`I'm sorry, I'm sorry.'" Lionel found that Alex was stiff and rigid, his eyes were closed, and he was gasping for breath. Lionel asked Rogers to call the 911 emergency dispatch service, and Alex was airlifted to Creighton University Medical Center. Alex was later transported to Children's Hospital, where he died on December 8, 2005.
An officer arrived at the scene and spoke with Rogers. Rogers reported to the officer that she had laid Alex on the carpeted area of the basement and gone upstairs to get milk and cereal for the children. When she went back downstairs approximately 5 minutes later, she observed an 18-month-old child bouncing and sitting on Alex's neck, straddling his head. She stated that she picked Alex up and noticed he was having trouble breathing, so she contacted Lionel. Another officer, Eric Sellers, later arrived at Rogers' house, and Rogers repeated this story to him. The two officers then went to the hospital to check on Alex's status.
At the hospital, the officers were informed that Alex had suffered a head injury and was being scheduled for immediate surgery to relieve blood pressure on his brain. A medical report dated December 5, 2005, explains: "The patient likely received blunt trauma injury to the head while at day care earlier this morning." Medical reports, dated December 5 and 6, diagnosed Alex as suffering from a "massive" traumatic brain injury resulting in an acute subdural hematoma. The hematoma was more marked posteriorly, but extended all the way from the anterior to the posterior of the brain. An ophthalmologic examination also found eye hemorrhages "consistent with non-accidental trauma." Because of the density of the hematoma, an examination on December 6 indicated that the injury had occurred within the past 0 to 4 days. Additionally, "chronic" hematomas were found in Alex's brain. The medical findings were determined to be "diagnostic of repeated episodes of inflicted trauma as aresult [sic] of shaken baby and[/]or shaken impact baby syndrome." The report of an autopsy conducted on December 9 attributed the cause of Alex's death to "blunt trauma to the head."
Rogers was first asked to go to the Douglas County sheriff's office to be interviewed on Tuesday, December 6, 2005. At that time, the officers had apparently not yet been informed of Alex's chronic brain injuries. Rogers met with Officer Brenda Wheeler in the polygraph room with the intention of conducting a polygraph examination. But when Rogers indicated that she might be pregnant, the polygraph was postponed. It is apparent from the record that a polygraph examination could not be performed if Rogers was pregnant, although the record does not explain why. Wheeler still spoke with Rogers about the events of December 5.
*44 Rogers explained to Wheeler that when the children first arrived in the morning, they ate breakfast. Alex went down for a nap shortly after arriving and slept in a "Pack-N-Play" until 9:15 a.m. Rogers said that when he woke up, she changed his diaper and the diaper of another child Alex's age. She put the other child in a "bouncy seat." Although Rogers had at least one other bouncy seat and two "saucers" nearby, she left Alex on the floor. Rogers could not provide Wheeler with any explanation for why she had done this.
Rogers explained that she then left all the children in the basement unattended while she went to get Alex and the other toddler's bottles, left the bottles to warm, went to the master bedroom to turn off the television, and looked in the freezer to consider what to make for lunch. Rogers told Wheeler that when she returned downstairs, she noticed that an 18-monthold child was straddling Alex's neck and that Alex was having trouble breathing. Rogers elaborated that she sometimes played "horsey" with the children. The interview ended, and Rogers returned home.
Following this interview, Wheeler received a telephone call from one of Alex's physicians, who advised Wheeler that Alex had been diagnosed with acute subdural hematomas and that there was evidence of two or three old subdural hematomas that were approximately 7 to 10 days old. The doctor clarified for Wheeler that Rogers' story of a child sitting or bouncing on Alex's neck was inconsistent with the severity of Alex's injuries.
By Wednesday, December 7, 2005, the officers knew that Alex might not survive his injuries and had evidence that those injuries had occurred at Rogers' residence on Monday, December 5. In light of this, Sellers and another officer went to Rogers' home and asked her and her husband to come to the station for a second interview. Sellers told Rogers that the interview would probably take only about 20 or 30 minutes.
Rogers agreed and arrived at the station shortly thereafter. Her husband was separated from her to wait in the lobby. Sellers took Rogers to a small, windowless room in a secure area. There, Sellers read Rogers her Miranda rights, which she waived. There is no evidence at this point, or at any time thereafter, Rogers was told that she was not under arrest or that she was free to leave the station.
Shortly after Rogers waived her Miranda rights, Rogers and Sellers were asked by another officer to move to a different area, because of a prisoner transport. They moved to the polygraph room, where Rogers sat in a polygraph chair with her back generally to the wall, facing in the general direction of the door. The polygraph chair was placed at the end of a desk, with the back of the chair angled slightly in front of the desk.
Initially, Sellers sat at the desk facing Rogers. He took notes as he asked Rogers routine questions about the events of December 5, 2005. Rogers repeated the story she had told Wheeler the day before. This continued for about 35 minutes. Sellers then offered Rogers a glass of water and left her in the room, where she stayed in the polygraph chair waiting for about 8 minutes. When Sellers returned, he gave Rogers a glass of water and explained that they had a panel of doctors who had told them that a child could not have caused Alex's injuries. He asked Rogers to "brainstorm" about anything else that might have occurred.
Soon after, Wheeler entered the room. She immediately pulled up a chair and sat in front of Rogers, placing herself between Rogers and the door to the room. There *45 was nothing between them, and Wheeler leaned close to Rogers. Sellers remained in the room, but moved to a different position, standing at the opposite corner of the desk and its adjacent wall. Wheeler explained that she had spent the entire morning at Children's Hospital and had spoken to the doctors and spoken in great detail with Alex's parents. She relayed to Rogers that she had discovered nothing unusual had occurred the morning before Alex's parents took him to Rogers' house. Wheeler explained to Rogers that based on what the doctors were saying, she knew something had happened at Rogers' house that Rogers was not telling her.
The mood of the interview began to change, and Rogers became more quiet, repeatedly answering that she did not know what had happened. Wheeler explained that she did not think Rogers had meant to hurt Alex but that with all the children she was watching, anyone could have been pushed "over the top." Wheeler stated that she already knew something "aggressive" happened, but now she just needed to know why. If Rogers was just overwhelmed, then that was "explainable."
Rogers said she would never hurt Alex, and Wheeler responded that even if all the children had combined their efforts, they would not have had the force sufficient to cause the injuries Alex had suffered. Wheeler told Rogers that only an adult could have inflicted the force necessary to hurt Alex in this manner and that the injury occurred close to the time that Alex began seizing. Wheeler then reminded Rogers that she was the only adult there at that time. When Rogers stated that she did not hurt Alex, Wheeler responded, "[T]he evidence is clear that you did." When Rogers said she did not know what had happened, Wheeler told Rogers that she did not believe her.
Sellers interjected with a gentler tone and explained that Alex was going to be fine. Sellers stated that the other parents were simply concerned about whether their children were in danger. Sellers suggested that maybe some sort of accident had occurred, such as accidentally dropping Alex. This, he explained, was not a crime and would be understandable to the other parents. Sellers started to ask Rogers questions about possible accidents that could have occurred that day. Wheeler took up this line of inquiry as well, explaining: "I'm giving you a way out here to tell me what else happened in your house."
Rogers denied that any accident had occurred, and Wheeler repeated that if they could not go to the doctors with a logical explanation for what happened, then it looked "very, very bad" for Rogers. Wheeler then spoke for some time, while Rogers remained generally quiet and repeated at several points that she did not know what had happened.
Sellers again began to speak to Rogers about possible accidents, and Wheeler left the room. Sellers moved to where Wheeler had been sitting and told Rogers he knew Rogers was a good person. Approximately 1 hour 12 minutes into the interview, Rogers began to cry. She informed Sellers that she had fallen down the stairs while holding Alex. After comforting Rogers, Sellers left, explaining that he had to go talk to his boss and that he would be right back. Rogers remained sitting in the polygraph chair for approximately 5 minutes while she waited for Sellers. When Sellers returned, he knocked on the door, and Rogers stood up for the first time since the interview had begun, let Sellers in, and immediately sat back down. Sellers mentioned that the door locked from the inside. He then began to ask *46 some simple followup questions, but soon Wheeler walked back into the room.
Wheeler immediately went to Rogers and gave her a hug. She sat down in front of Rogers, very close to her, and grasped both of Rogers' hands. Wheeler then said firmly, "We have one more step to take here, don't we?" Wheeler explained that they had spoken with the doctors and had determined that Alex's injuries were caused by his head's being moved at a velocity much greater than what would have occurred by his falling down the stairs. Wheeler continued to sit in front of Rogers, grasping both Rogers' hands, for another 10 minutes while she questioned her. Rogers repeatedly responded that she did not hurt Alex.
Wheeler informed Rogers, for the first time, that not only did the doctors find the acute injury that had occurred on December 5, 2005, but they had also found some older injuries. These, Wheeler explained, obviously were not caused by a fall down the stairs on December 5. Rogers' story, Wheeler told her, had to match the medical evidence. Wheeler eventually left the room again. As she left, Wheeler stated that she knew Rogers had a good rapport with Sellers. Wheeler explained firmly that she expected Rogers to tell Sellers the truth, "and I mean the whole truth this time."
Rogers did not, however, confess to Sellers. Almost 2 hours into the interview, Sellers again left Rogers alone in the room, saying he would be right back. As he left, Sellers explained to Rogers that the door to the polygraph room locked automatically from the inside and that he did not have a key. So he asked that Rogers let him in if he knocked and further explained, "so you can get out if you need to, I just can't get in." Rogers did not attempt to leave.
Almost immediately after Sellers left, Wheeler let herself back into the room with her key and resumed her position directly in front of Rogers. Wheeler started to talk to Rogers about themes of honesty and integrity. She eventually returned to the theme of the medical evidence and how they both knew that Rogers was not telling the truth. In the face of these accusations, Rogers became increasingly withdrawn and despondent. At one point, after Wheeler repeatedly accused Rogers of holding something back, Wheeler stated: "We're not going to get to the bottom of this until I get the whole truth." Rogers responded: "No, I'm not. I'm done. I won't."
But Wheeler continued to talk to Rogers about how what "really happened" was going to "eat" at Rogers "forever and ever." Wheeler told Rogers that the doctors needed to know the truth in order "to know best how it happened, and it wasn't a fall down the stairs. Something else happened." Rogers answered: "Yes, it was. I didn'tII'm not talking no more."
Wheeler responded, "Well, just listen then." And Rogers sat quietly while Wheeler spoke to her at length. Wheeler was eventually able to reengage Rogers in conversation, and, some 2 hours after the interview began, Rogers confessed. Rogers eventually told Wheeler that while Alex was lying on his back on the floor, she had grabbed him by both sides of his head and neck and shaken him. When asked, Rogers said that she thought she slammed Alex's head onto the floor each time she shook him. She also admitted to having shaken Alex on at least two prior occasions.
Rogers was not arrested on that day and was allowed to return home that night. The next day, after Alex died, an arrest warrant was issued.
*47 At trial, Rogers filed a motion to suppress any statements she made during her interviews with investigators. Rogers claimed in her motion that her statements were not voluntarily given, her free will had been overridden, her statements were not trustworthy, she did not have an attorney present, and she had been misled by investigators before and during the interview.
At the hearing on the motion, Wheeler and Sellers both testified, and the videotape of the December 7, 2005, interview was entered into evidence. When Rogers' attorney asked Wheeler why she did not stop the interview when Rogers said she was done talking, Wheeler testified that they were trained to continue to interview suspects until the suspect says, "`I want a lawyer' or something to that effect. `Attorney', `lawyer', or `I want to leave', something to the effect of `charge me or let me leave.' Something like that. And she said neither."
The motion to suppress was overruled, and Rogers was convicted and sentenced to life imprisonment. She appeals.

ASSIGNMENTS OF ERROR
Rogers assigns that the district court erred in (1) overruling her motion to suppress her statement made to investigators, (2) imposing an excessive sentence, and (3) overruling her motion to declare that the mandatory minimum sentence of 20 years' imprisonment for child abuse resulting in death is unconstitutional because it violates the Equal Protection Clause and the Separation of Powers Clause.

STANDARD OF REVIEW
[1] In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in Miranda v. Arizona,[2] we apply a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law which we review independently of the trial court's determination.[3]
[2] Mixed questions of law and fact are generally defined as those that have a factual component, but that cannot be resolved without applying the controlling legal standard to the historical facts.[4] In State v. Thomas[5] and State v. Mata,[6] we said that "[r]esolution of ambiguity in the invocation of the constitutional right to remain silent is a question of fact." To the extent that the ambiguity derives from conflicting evidence of the historical facts, such as the surrounding circumstances or what was actually said, this statement is correct. However, insofar as we have suggested that we should also treat as a question of fact the trial court's legal conclusion on whether the suspect invoked the right to remain silent, based on the application of those circumstances to the rubric of Miranda, we erred.
[3] Thus, while we recognize that we have not always been precise in distinguishing issues of historical fact from *48 questions of law within these mixed questions of law and fact,[7] for purposes of clarity and uniformity, we expressly do so now. It is a mixed question of law and fact whether a statement was voluntarily made,[8] whether a custodial interrogation has occurred,[9] whether sufficient Miranda warnings were given to the suspect,[10] whether properly advised Miranda rights were thereafter waived,[11] whether there has been an unambiguous invocation of the right to remain silent or to have counsel,[12] and whether invocation of those rights has been scrupulously honored.[13] All these questions involve the application of the facts surrounding the confession to the constitutional rubric mandated by the U.S. Supreme Court, and are reviewed under the two-point standard of review set forth above.[14]

ANALYSIS

MIRANDA V. ARIZONA
[4] The rubric of prophylactic safeguards[15] *49 to protect individuals from the "`inherently compelling pressures'"[16] of custodial interrogation was first established by the U.S. Supreme Court in Miranda v. Arizona.[17] The need for these safeguards derives from the Supreme Court's conclusion that the "coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be `accorded his privilege under the Fifth Amendment ... not to be compelled to incriminate himself.'"[18] Otherwise stated, the Fifth Amendment gives one the right "`"to remain silent unless he chooses to speak in the unfettered exercise of his own will."'"[19]
Earlier decisions by the U.S. Supreme Court had already established that when the totality of the circumstances of an interrogation, considered against the power of resistance of the person confessing, actually operate to overbear the suspect's will and compel the confession, then the confession would be considered involuntary and inadmissible.[20] The focus of the Supreme Court in Miranda was somewhat different. The Court explained that while the pressures of the average custodial interrogation may not produce a confession that is "involuntary in traditional terms,"[21] in the context of modern methods of custodial police interrogation,[22] neither is any statement obtained from the interrogation "truly ... the product of his free choice."[23] Instead, the pressures of custodial interrogation "work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."[24]
The Court in Miranda described in great detail the pressures to which it was referring: A suspect is usually questioned away from his or her familiar environment and isolated from family or friends who might lend moral support. Having isolated the suspect, the questioning officer or officers then use "`emotional appeals and tricks,'"[25] minimizing the moral seriousness of the offense and directing comment toward the reasons why the suspect committed the offense, "rather than court failure by asking the subject whether he did it."[26] A common tactic is then for one officer to act sympathetic, while the other is more forceful, and the two trade off in questioning the suspect. When these strategies do not produce a confession, the officers rely "`on an oppressive atmosphere *50 of dogged persistence'" and attempt to "`dominate [their] subject and overwhelm him with [their] inexorable will to obtain the truth.'"[27]
The Court noted that to be successful in this psychological coercion, "[i]t is important to keep the subject off balance ... by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights."[28] Thus, "[e]ven without employing brutality, ... the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals."[29]
[5] To counter these pressures, and thereby to "protect precious Fifth Amendment rights,"[30] the Court in Miranda established the familiar Miranda advisements of the right to remain silent and to have an attorney present at questioning. The Court further explained that once these warnings have been given, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."[31] For, "[a]t this point[,] he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."[32]
[6] The Court described this as the right to "cut off questioning."[33] And it does not matter, the Court explained, whether or not the suspect had initially waived his or her rights and answered questions: "The mere fact that [the suspect] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."[34]
In this appeal, Rogers does not argue that the evidence proves her statement was involuntary in the sense that her will was actually overborne. Nor does she argue that she was improperly advised of her Miranda rights or that she did not initially waive those rights. Instead, Rogers' claim is that the officers failed to honor her right to cut off questioning.
[7] In subsequent cases, the U.S. Supreme Court has explained that once the right to cut off questioning has been invoked, the police are restricted to "`scrupulously honor[ing]'" that right.[35] This means, among other things, that there must be an appreciable cessation to the interrogation.[36] However, before the police are under such a duty, the invocation of the right to cut off questioning must be "unambiguous," "unequivocal," or "clear."[37] This requirement of an unequivocal invocation, the Court has explained, prevents the creation of a "third layer of prophylaxis" which could transform the *51 prophylactic rules of Miranda "`into wholly irrational obstacles to legitimate police investigative activity.'"[38] To invoke the right to cut off questioning, the suspect must articulate his or her desire with sufficient clarity such that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.[39] And if the suspect's statement is not an "unambiguous or unequivocal" assertion of the right to remain silent, then there is nothing to "scrupulously honor" and the officers have no obligation to stop questioning.[40] In this case, the district court determined that Rogers had failed to unambiguously invoke her right to cut off questioning.

SCOPE OF ROGERS' MOTION TO SUPPRESS
[8, 9] Before addressing the merits of whether Rogers did or did not unambiguously invoke her right to remain silent, we briefly address the State's argument that the issue of Rogers' invocation of her right to cut off questioning was never properly raised below. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.[41]
[10, 11] Rogers' motion alleged, among other things, that her confession was not "voluntarily made." But the State asserts that, as a matter of law, references to "voluntariness" refer only to an inquiry into whether the will of the suspect was actually overborne, and do not encompass the issues raised by Miranda.[42] As our discussion above of the Court's holding in Miranda already demonstrates, this is simply not true. The U.S. Supreme Court has explicitly stated that it recognizes "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."[43] Cases examining whether the defendant's will was overborne by the circumstances surrounding the giving of a confession fall under the Due Process Clause of the 14th Amendment[44]; cases examining the prophylactic safeguards established in Miranda and its progeny fall under the 5th Amendment's Self-Incrimination Clause (incorporated and made applicable to the states through the 14th Amendment).[45]
Moreover, it is clear from the hearing on the motion to suppress that the parties were actively presenting to the court their views on whether Rogers had unambiguously invoked her right to remain silent. Thus, the court, in its order, actually determined that Rogers had not "unequivocally demand[ed] that any of the interviews be terminated."
Rogers' motion did not limit itself to "voluntariness" issues under the 14th Amendment, and we agree that voluntariness inquiries under both the 5th and the 14th Amendments were properly before *52 the trial court. Having found that the constitutional issues involving Rogers' claimed unequivocal invocation of her right to remain silent were raised below, we turn now to an analysis of those issues.

CUSTODY
[12, 13] Before considering whether the police infringed upon a suspect's Fifth Amendment right to cut off questioning, a court should first consider whether the suspect's confession took place during a "custodial interrogation." The rights provided by Miranda and its progeny, including the right that the police "scrupulously honor" one's invocation of the right to remain silent, are only applicable in the context of a "custodial interrogation."[46] It is only in this context that the prophylactic safeguards of Miranda are considered justified and necessary.
[14, 15] "Interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.[47] "Custodial" does not require an arrest, but refers to situations where a reasonable person in the defendant's situation would not have felt free to leaveand thus would feel the "`"restraint on freedom of movement" of the degree associated with a formal arrest.'"[48] The parties do not dispute that Rogers was being "interrogated" by the officers at the time she made her confession, but some question has been raised as to whether Rogers was in custody at the time she confessed.
We note at the outset that it appears, from the examination of the witnesses and the discussion with the court during the suppression hearing, that there was little dispute between the parties at that time that Rogers was, in fact, "in custody" when she confessed. When examining the witnesses at the suppression hearing, the State did not ask questions that would have been relevant to the issue of custody. Instead, the examination was focused almost entirely on Rogers' alleged invocation of her right to remain silent. As discussed, if Rogers was not in custody, the alleged invocation of her Fifth Amendment rights would not even have been at issue. The trial record indicates that the parties and the district court believed Rogers was in custody.
In accord with the assumptions of the parties, the district court determined that Rogers was in custody at the time of her confession. The district court's order, while not perfectly drafted, is hard to read otherwise. In denying the motion to suppress, the court first described the two interviews of Rogers at the sheriff's office. The court next described Rogers' informal conversations with the officers at Rogers' home and over the telephone, during which, the court specified, Rogers was "not in custody." Immediately following these two descriptions, the court said that "the statements of [Rogers] both while not in custody and while in custody were freely and voluntarily made." The court clearly found that some of Rogers' statements were custodial, and, having expressly eliminated *53 the interviews not at the station, we find it difficult not to understand the district court's reference to times "in custody" to be the previously mentioned station house interviews.
Now, on appeal, the State belatedly attempts to contest whether Rogers was in custody at the time of her confession. But even the State's initial brief, while alleging that Rogers was not in custody on December 6, 2005, seemed to assume that she was in custody on December 7. As at trial, the State argued in its trial brief that Rogers had failed to properly invoke the Miranda protections. But in a supplemental brief filed in this court, the State asserted a new argument that "because there was no formal arrest nor any restraint on freedom of movement of the degree associated with a formal arrest, during either the December 6, 2005, or the December 7, 2005, interview, Rogers was not in custody."[49] Rather than give any supporting argument for this conclusion, however, the State attacked the wording of Rogers' motion to suppress, an argument that we have already considered above.
But to the extent that the State's supplemental brief can be construed as attacking the district court's determination that Rogers was in custody during the December 7, 2005, interrogation, we disagree with the State's contention. The parties do not contest the underlying historical facts of this case. We have information about the events leading up to Rogers' arrival at the station on December 7, as derived from the sheriff's reports and testimony. We have the videotape of the interview itself. Because we have no questions of fact to review for clear error, the only issue remaining is the application of the historical facts to the applicable constitutional principles.[50] We independently review the district court's conclusion regarding whether, under these facts, a reasonable person under all of the surrounding circumstances would have felt free to leave.[51] We agree with the district court that under the facts of this case, Rogers was in "custody" on December 7.
[16, 17] The U.S. Supreme Court has explained that the relevant inquiry in determining "custody" is whether, given the objective circumstances of the interrogation,[52] "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."[53] This is the level of "restraint on freedom of movement"[54] that demands Miranda protections in connection with an interrogation. Two inquiries are essential to this determination: (1) an assessment of the circumstances surrounding the interrogation and (2) whether, given those circumstances, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.[55] *54 Put another way, the Court has said that we must examine all of the circumstances surrounding the interrogation to determine whether a reasonable person in the suspect's position would have thought he or she was "sitting in the interview room as a matter of choice, free to change his [or her] mind and go."[56]
[18] A large body of case law has developed since Miranda that has made apparent certain circumstances that are most relevant to the custody inquiry. Such circumstances include: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave; (2) whether the contact with the police was initiated by them or by the person interrogated, and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it.[57]
[19, 20] In State v. Mata,[58] we also found helpful to our analysis of whether the suspect was in custody, six common indicia outlined by the Eighth Circuit Court of Appeals in U.S. v. Axsom.[59] Three of these indicia are considered mitigating against the existence of custody: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; or (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions. Three indicia are considered as aggravating the existence of custody: (1) whether strong-arm tactics or deceptive stratagems were used during questioning, (2) whether the atmosphere of the questioning was police dominated, or (3) whether the suspect was placed under arrest at the termination of the proceeding.
[21, 22] Any interview of one suspected of a crime by a police officer will have coercive aspects "simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."[60] Such coercion, alone, is insufficient to establish the "restraint on freedom of movement" necessary for "custody."[61] Nevertheless, we note that in determining whether a reasonable person in the suspect's position would feel the necessary restraint on freedom of movement, the coerciveness of the interrogation environment is still pertinent[62]:

*55 Because the Court in Miranda expressed concern with the coerciveness of situations in which the suspect was "cut off from the outside world" and "surrounded by antagonistic forces" in a "police dominated atmosphere" and interrogated "without relent," circumstances relating to those kinds of concerns are also relevant on the custody issue. Thus, custody is less likely to be deemed present when the questioning occurred in the presence of the suspect's friends or other third parties, and more likely to be found when the police have removed the suspect from such individuals. A court is more likely to find the situation custodial when the suspect was confronted by several officers instead of just one, when the demeanor of the officer was antagonistic rather than friendly, and when the questioning was lengthy rather than brief and routine. And surely a reasonable person would conclude he was in custody if the interrogation is close and persistent, involving leading questions and the discounting of the suspect's denials of involvement.[63]
The facts of any given particular station house interrogation will be unique. While we will not find another case that exactly matches the situation presented here, for illustration of how these legal principles are applied in comparable circumstances, we consider State v. Dedrick.[64] In Dedrick, the defendant voluntarily went to the police station after they had asked him to come answer some questions. Once at the station, the police told the defendant he was not under arrest and took him to an interview room. The room was windowless, and the defendant and two officers sat at a round table. Throughout the interview, one officer sat in front of the door, while the other sat opposite, and the defendant sat in between them. The door remained closed, but apparently was not locked. The defendant initially drank a soda he had brought with him and answered general questions about his background and activities. At one point, he left the room alone to use the restroom.
After the defendant had completed his initial story about the events of the night of the crime, the officers left the defendant alone in the room so that they could confer. When the officers returned, the nature of the questioning changed. The officers again stated that the defendant was not under arrest, and they read him his Miranda rights. They then informed the defendant for the first time that the victim was dead. They further informed the defendant that they knew the victim owed the defendant money. And they stated that bloody fingerprints and footprints found at the scene probably matched the defendant's. Despite the defendant's repeated denials of any involvement in the murder, the officers continued to accuse the defendant of stating untruths, and they continued to confront him with incriminating information. They no longer reminded him that he was not under arrest.
The court in Dedrick agreed with the trial court's determination that this "sea change" in the tenor and character of the interview would indicate to a reasonable person that he or she was not free to go.[65] Instead, a reasonable person would have believed that "as often as he made denials, *56 [the officers] would renew their accusations."[66] In the face of such repeated accusations, a reasonable person, the court concluded, would believe he or she was not free to leave.[67]
We likewise conclude that Rogers was "in custody," because a reasonable person in her position would not have felt free to simply terminate the interview and leave. In making this determination, we consider the Axsom indicia, as well as the additional considerations outlined above.
Strictly speaking, Rogers went to the station voluntarily. But we also note that her visit was prompted by two officers arriving at her house and asking her to return to the station for further questioning and a possible polygraph examination. In light of these circumstances suggesting that Rogers was pressured to attend, the "voluntariness" of Rogers' visit to the station is less of a mitigator against custody.
And once at the station, the atmosphere was clearly police dominated. Rogers was separated from her husband and any neutral parties and taken to a secure area to be read her Miranda rights and questioned. Rogers was then escorted to the polygraph room where she sat in an examination chair for over 2 hours while being questioned intensively by two officers.
Although Rogers was not physically restrained during the interrogation, in the sense of being handcuffed or locked in a room, the positioning of the officers during questioning would have made it hard for her to leave. We note that Rogers would have had a hard time even standing up when Wheeler was grasping both her hands. Additionally, with the exception of brief periods during which Rogers waited in the room alone, once the interrogation became more accusatory, Rogers' only exit from the room was continuously blocked by either Sellers or Wheeler sitting very close, knee to knee, in front of her.
After its initial phase, the questioning of Rogers became verbally dominated by the officersconfrontational, and more aggressive. Wheeler told Rogers that they knew she had hurt Alex and that they only sought answers as to her motivation. Sellers made clear to Rogers that shaking a baby would be a crime, while a fall or similar accident would not be. Sellers also told Rogers, deceptively, that Alex was going to be okay, although Sellers knew this to be untrue. Once Rogers was caught in a lie about falling down the stairs, Rogers was no longer given the impression that an accident would suffice as an explanation. She was expected to admit in detail to what the officers already knew she had done. Some sort of aggression by Rogers against Alex was, as Wheeler stated, the only logical explanation for the medical evidence.
A statement by the officers to Rogers that she was free to go obviously could have had a significant impact on whether a reasonable person in Rogers' position would have felt free to go.[68] Rogers was *57 not, however, told she was free to gonot even once. In fact, when Rogers finally declared that she was "done" and was not going to talk any more, the officers still failed to indicate in any way that she was free to leave. To the contrary, Rogers was told to "just listen then." Rather than being told she was free to leave, Rogers was essentially told to sit there and listen.
We find Sellers' statement regarding the functioning of the door to the room merely an explanation to Rogers that she was not being locked in alone. Being physically capable of getting out of a room is not the same as being given permission to walk out of a station full of police officers and simply go home.
It is true that Rogers was, after she confessed, eventually allowed to go home. But we find this fact to be of little consequence, compared to the other indicia of custody, when a reasonable person in Rogers' position at the time of her confession would not have believed that was going to occur. Rogers was essentially told that the officers had probable cause to arrest her. Knowing this, without additional circumstances indicating otherwise, it is hard to imagine that a reasonable person in Rogers' position would think that the officers would allow that person to just get up and leave.
Rogers experienced approximately 2 hours of isolation in a police-dominated atmosphere, physically blocked from the exit, and subjected to aggressive accusatorial interrogation in which she was confronted with substantial evidence to prove her guilty of a crime. Rogers was "in custody" for purposes of the Miranda protections.

UNEQUIVOCAL INVOCATION
[23] The next inquiry is whether Rogers invoked the Miranda protections to which she was entitled. Rogers claims she invoked the right to remain silent and that the officers failed to scrupulously honor that right. Like custody, the question of whether a suspect has invoked the right to remain silent is a mixed question of law and fact.[69] We thus review the district court's findings of historical fact for clear error, but review de novo the application of the constitutional principles to these facts.[70] In this case, there are no historical facts in dispute and all the circumstances relevant to the invocation question are contained in the videotape of the December 7, 2005, interrogation. The only question is whether, as a matter of law, a reasonable police officer presented with these circumstances would have understood *58 Rogers' statement as an invocation of the right to remain silent.[71]
[24, 25] As mentioned, the safeguards of Miranda "`assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.'"[72] The suspect has the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation."[73]
[26-28] On the other hand, officers should not have to guess when a suspect has changed his or her mind and wishes the questioning to end. They are not required to accept as conclusive any statement or act, no matter how ambiguous, as a sign that a suspect desires to cut off questioning.[74] Instead, officers are bound only when the suspect makes a statement that, considered under the circumstances in which it is made, a reasonable police officer would have understood to be a request to cut off all questioning.[75] In other words, to effectively invoke the protections of Miranda, the suspect's invocation of the right to remain silent must be "unambiguous," "unequivocal," or "clear."[76]
[29-31] In considering whether a suspect has clearly invoked the right to remain silent, we review not only the words of the criminal defendant, but also the context of the invocation.[77] Relevant circumstances include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation.[78] A court might also consider the questions that drew the statement, as well as the officer's response to the statement.[79]
As is the case for the custody inquiry, while a determination of invocation will always depend on an analysis of the circumstances in a particular case, patterns have emerged from the case law that provide context to our application of these rules. For instance, generally, courts have found statements prefaced by words of equivocation, such as "I think," "maybe," or "I believe," or phrased in terms of a *59 hypothetical, such as, "`If I don't answer any more questions, then what happens?"'[80] to be equivocal, although the surrounding circumstances are still considered before making this conclusion.[81] In Com. v. Almonte,[82] for example, the court rejected the defendant's argument that he had clearly invoked his right to remain silent by saying, "`I believe I've said what I have to say.'" In so concluding, the court looked not only to the language of this "isolated remark,"[83] but also to the surrounding circumstancesthat the defendant had initiated the confession by coming to the police station unbidden and had seemed calm and under control throughout the interrogation.
[32] Even absent express words of equivocation, it is unlikely for a statement to be an unequivocal invocation of the right to remain silent if the language of the statement itself indicates simply that the suspect has finished his or her colloquy of eventsas opposed to a wish to cease speaking altogether.[84] Thus, in light of the circumstances presented, statements such as "`that's it'"[85] and "`So, that's all I[got] to say'"[86] have been found not to be clear invocations of Miranda rights. Conversely, where the suspect says he or she is not yet ready to speak, "now," or "at this time," courts have likewise found, under the circumstances presented, that the statement was equivocal.[87]
[33] Statements which indicate only the suspect's desire to avoid answering a particular question or to avoid speaking about particular themes have also been held, under the circumstances, not to trigger Miranda protections.[88] This is because an invocation of the right to remain silent is a communication that the suspect *60 wishes questioning as a whole to cease.[89]
[34] Finally, courts have found, under certain circumstances, that a suspect fails to unequivocally invoke the right to remain silent when what might otherwise be a clear statement is inextricably attached to language inconsistent with a wish to remain silent. While statements made by the suspect after an invocation of the right to cut off questioning may not generally be used to interject ambiguity where originally there was none,[90] the analysis is different where a single statement under consideration is internally inconsistent. Courts have thus found ambiguity where an utterance conveying a desire to end questioning is "separated by little more than a breath"[91] from further utterances that would lead a reasonable officer to doubt whether the defendant in fact wished to do so.[92]
In State v. Thomas, for instance, we found that the defendant had not clearly invoked the right to remain silent when his statement, "`I'm done talkin' man,'" was followed directly by "a question requesting further information, which also acted to encourage further dialog."[93] The statement Kelvin L. Thomas made to police during questioning was, "`I'm done talkin' man, I know what I did, how can ya'll keep on saying I did it[?]'"[94] The statement, we observed, was made when Thomas interrupted accusations by the officers. And Thomas continued to converse with the officers after he made the statement. We concluded that a reasonable police officer could have interpreted this "single statement" as merely an expression of Thomas' frustration with the investigators' unwillingness to believe him.[95] It was not, therefore, "a clearly stated intent to end the interview."[96]
On the other hand, certain types of statements, neither prefaced nor immediately followed by words diminishing their meaning, are generally considered to be clear and unambiguous invocations of the right to cut off questioning. For instance, when the defendant in Anderson v. Terhune[97] attempted to stop police questioning by stating, "`I don't even wanna talk about this no more,'" "`Uh! I'm through with this,'" and "`I plead the Fifth,'" the court held that the defendant's invocation of his right to remain silent was not only unequivocal, but "pristine." Similarly, the court in State v. Goetsch[98] found the suspect's statement, "`I don't want to talk about this anymore,'" to be clear, and the *61 statement, "`I don't want to talk no more,'" was found by the court in Com. v. King[99] to be likewise unambiguous. The court in People v. Douglas[100] concluded that the defendant's statement, "`I have nothing further to say,'" could not have been interpreted by a reasonable police officer as anything other than an expression that he wished to stop answering police questions, and thus, remain silent.
In Mayes v. State,[101] the suspect, after waiving her Miranda rights and speaking for approximately 30 minutes about how she thought she was being framed, stated, "`I'm going to stop talking'" when the interrogation became more confrontational. The officer continued speaking to the suspect, and 4 minutes later, the suspect said, "`I'm going to shut up. I'm not going to say another goddamned thing.'"[102] The court concluded that these statements evinced an unequivocal declaration of her desire to halt further commentwhich thus obligated the officers to end their interrogation.[103] Similarly, "`I'm done talking'" was a sufficient invocation of the right to remain silent in State v. Kramer,[104] and several cases have held that the simple statement "I'm done" was a clear invocation under the circumstances surrounding the interrogation.[105]
In this case, we conclude that Rogers unambiguously invoked her right to remain silent. When Wheeler kept insisting that they were going to "get to the bottom of this" and "get the whole truth," Rogers responded: "No, I'm not. I'm done. I won't." But Wheeler pressed on at length about how guilt would "eat" at Rogers "forever and ever" if she did not confess. While working these themes, Wheeler tried to reengage Rogers with direct questions, but Rogers answered only with simple "no's." When Wheeler then tried the accusation, "and it wasn't a fall down the stairs. Something else happened," Rogers responded in no uncertain terms: "Yes, it was. I didn'tII'm not talking no more." (Emphasis supplied.)
Nothing before or after Rogers' statements marred their clarity. Rogers said that she was "done," she would no longer be helping Wheeler to "get to the bottom of this," and she was "not talking no more." Furthermore, we observe that Rogers' demeanor and tone when making these statements conveyed the finality with which she intended them. Rogers did not seek to reengage in conversation, but sat silent immediately after making the statements.
Not only should a reasonable officer in Wheeler's position have understood those statements to be an invocation of the right to remain silent, it appears that Wheeler actually understood the statements in this way, because Wheeler responded: "Well, just listen then." Wheeler's instruction to "just listen" implicitly acknowledged that Rogers intended to stop talking. But Wheeler's training, by her own admission, had apparently not informed her that a suspect's statements, such as "I'm done" *62 and "I'm not talking no more," should be scrupulously honored. So, Wheeler pressed on, and was eventually able to extract a confession.
[35] The State's reliance on State v. Thomas,[106] as support for its argument that Rogers' statements were not a clear invocation, is misplaced. Not only was Thomas' statement internally inconsistent with the alleged invocation, as already discussed, but the context of his statement was also different. Thomas, already a convicted felon, said that he was "done talkin[g]" in the midst of an argumentative dialog in which he appeared to be seeking information about what the police already knew and the probable consequences of his acts if he confessed. In this case, despite the fact that Rogers was visibly intimidated and had no prior experience with the justice system, Rogers made not one, but two clear requests that the questioning cease. There were no internal inconsistencies to these requests, and as already mentioned, unlike Thomas, Rogers did not casually continue dialog or seek additional information, but ceased for a long time to speak at all. A suspect is not required to use special or ritualistic phrases to invoke the right to remain silent, and a reasonable police officer should have understood that Rogers was invoking her right to remain silent.[107] We find, considering all the surrounding circumstances of the statements in issue, that Rogers effectively invoked her Fifth Amendment rights.

SCRUPULOUSLY HONOR
[36, 37] It is the mandate of the U.S. Supreme Court that the protections of Miranda be strictly adhered to when a suspect is subjected to the inherently coercive environment of modern custodial interrogations. The techniques common to such interrogations are not per se prohibited, but suspects must be protected from the coercion of these techniques by being advised of their Miranda rights and by the scrupulous honoring of those rights if they are invoked. The U.S. Supreme Court has made it clear that the police do not "scrupulously honor" a suspect's invocation of the right to remain silent when they press on with little or no cessation in the interrogation.[108] The Court prohibits officers from simply persisting in repeated efforts to wear down the suspect's resistance and change his or her mind about the invocation.[109] But that is exactly what happened here. Thus, Rogers' invocation of her right to remain silent was not scrupulously honored.

HARMLESS ERROR
[38-40] We therefore conclude that it was error for the trial court to deny Rogers' motion to suppress and to admit the confession that was taken in violation of Rogers' Miranda rights. Still, even a constitutional error does not automatically require reversal of the conviction if that error is a "`trial error'" and not a "structural defect."[110] As the U.S. Supreme Court has noted, the admission of an improperly obtained confession is a "trial error," and thus, its erroneous admission is subject to the same "harmless error" standard as other trial errors.[111] We consider *63 whether the admission of Rogers' confession was harmless error.
[41] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[112]
There was substantial circumstantial evidence incriminating Rogers in this case that may well have been sufficient, without the confession, to sustain a conviction. But we cannot conclude, on our review of the record, that such evidence was so overwhelming that the verdict was surely unattributable to the erroneous admission of Rogers' confession.[113] We cannot find the admission of Rogers' confession to be "harmless," and we therefore find that the judgment should be reversed.

DOUBLE JEOPARDY
[42, 43] Having found reversible error, we must determine whether the totality of the evidence admitted by the district court was sufficient to sustain Rogers' conviction. If it was not, then concepts of double jeopardy would not allow a remand for a new trial.[114] The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.[115] We find that Rogers' confession and the circumstantial evidence against her were sufficient to sustain the verdict. We therefore reverse the conviction and remand the cause for a new trial.

REMAINING ASSIGNMENTS OF ERROR
[44] In her remaining assignments of error, Rogers contends that the district court erred in imposing an excessive sentence and in overruling her motion to declare that the mandatory minimum sentence of 20 years for child abuse resulting in death is unconstitutional, because it violates the Equal Protection Clause and the Separation of Powers Clause. Because we have determined that the district court committed reversible error by admitting statements made by Rogers after her invocation of her right to remain silent, we do not address these assignments of error. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.[116]

CONCLUSION
For the reasons discussed, we conclude that the district court erred in denying Rogers' motion to suppress to the extent that the court admitted statements made by Rogers after she unambiguously invoked her right to remain silent. Because the evidence presented by the State was sufficient to sustain Rogers' conviction, we reverse the conviction and remand the cause for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
*64 GERRARD, J., concurring.
April Rogers was asked to come to the sheriff's office for interrogation, where she was placed in a small room and relentlessly questioned by two officers for over 2 hours. Yet, the dissenting justices would find that she was not in police custody. And before Rogers broke down under interrogation, she told the officers that she was "done" and "not talking no more." But one of the dissenting judges believes she did not invoke her right to remain silent. The fact of the matter is that when Rogers said she was done talking, the law required the officers to stop questioning her. The U.S. Supreme Court has been quite clear on that point, and we are not at liberty to disagree. Therefore, I join the majority's opinion concluding that Rogers' statement to officers should not have been admitted into evidence. And for these further reasons, I concur.

STANDARD OF REVIEW
The first dissenting opinion begins by questioning our standard of review. But the dissent's criticism reads too much into our decisions in State v. Thomas[1] and State v. Mata.[2] The standard of review for a mixed question of law and fact, as explained in our opinion, is to review the trial court's factual findings for clear error, but whether those facts meet constitutional standards is a question of law.[3] Although Thomas and Mata did not clearly articulate that distinction, they do not demand the interpretation given them by the dissenting opinion.
And the dissent's criticism of this two-pronged standard of review fails to account for its flexibility. The dissent suggests that the trial court, with the benefit of live testimony, is in a better position to make an invocation inquiry. But live testimony is uniquely helpful only in making factual determinations, on which we properly defer to the trial court's conclusions. Live testimony does nothing to illuminate a court's evaluation of what the federal Constitution requires.
Even more problematic is the dissent's suggestion that we should "reserve action" on articulating our standard of review, because the parties neither briefed nor argued it. That assertion is not correct. Both parties, in their briefs, set forth the propositions of law they believed relevant to the standard of review for Rogers' motion to suppress her statement.[4] And the standard of review set forth in the State's brief is not the one endorsed by the dissenting opinionit is the one set forth in the majority opinion.[5] In any event, the parties properly addressed the standard of review and the majority opinion correctly articulated and applied it.

INVOCATION OF RIGHT TO REMAIN SILENT
The first dissent begins its discussion of invocation by misapprehending our decision in Mata.[6] The language relied upon by the dissent as being ambiguous"`I will plead the fifth right now'"was held to *65 clearly invoke the Fifth Amendment rights of the defendant in Mata, and his statements after that point were suppressed.[7]
But more generally, the dissent oversimplifies this analysis by focusing almost exclusively on the exact words spoken by the suspect, rather than considering the context and manner in which they were used. And I am not persuaded by the dissent's suggestion that we should rely only on Nebraska cases. This is a question of federal constitutional law, on which other state and federal courts have at least equal experience, in which more factually comparable cases have arisen, and the decisions of which are particularly helpful because they provide a more comprehensive discussion of context than our decisions to this point have required.
Nor am I persuaded by the dissent's exhaustive parsing of Thomas.[8] Despite the dissent's attempts to find deeper meaning in it, Thomas was really a very simple case, in which we relied on the ambiguity of the suspect's uninterrupted statement. The defendant in Thomas, Kevin L. Thomas, never clearly sought to invoke his right to remain silent.
Instead, he interrupted an accusation that he had committed the crime by stating, "I'm done talkin' man, I know what I did, how can ya'll keep on saying I did it." After this, Thomas continued to converse with the officers. Thomas' single statement that he was done talking could be interpreted as a response in frustration to the investigators' unwillingness to believe that he was not involved in the crime instead of a clear invocation of his right to remain silent. Thomas also followed the statement by a question requesting further information, which also acted to encourage further dialog. This single statement was not a clearly stated intent to end the interview. Had he wanted to terminate the interview, he could have made his wishes clear.[9]
The majority opinion persuasively explains why the circumstances of Thomas are distinguishable from this case. And the dissent is attacking a straw man in discussing whether the criminal histories of Thomas and Rogers are relevant. Contrary to the dissent's suggestion, our analysis in this case does not turn on that fact. Our opinion in Thomas set forth lengthy quotations from the police interview of Thomas. It is difficult to characterize the cat-and-mouse aspects of those colloquies without noting that Thomas' strategy was informed by his experience. But that simply describes the interviews to benefit the reader who has not seen the evidence. Our opinion in this case plainly concludes that Rogers' words were unambiguous, just as Thomas' were not, and Rogers' relative lack of a criminal history is not essential to that analysis.

CUSTODY
On the custody issue, the first dissent primarily relies on oversimplifying the rubric to be applied to such questions. While a categorical examination of factors to be considered can be helpful, the dissent's attempts to reduce it to a mathematical inquiry take the phrase "totality of the circumstances" far too literally. Although it reaches a different conclusion on this issue, the second dissenting opinion persuasively explains why our analysis should be broader than the six factors in U.S. v. *66 Axsom[10] when more complicated circumstances warrant it, as these do.
Nor am I persuaded by the first dissent's almost exclusive reliance on Yarborough v. Alvarado.[11] The dissent attempts to sidestep the most pertinent distinction between Alvarado and the present case the issue in Alvarado was not whether the suspect was in custody when he confessed. Rather, the issue was whether a California state court's decision was clearly unreasonable pursuant to the Antiterrorism and Effective Death Penalty Act of 1996.[12] In such a case, as the Court clearly explained, "[w]e cannot grant relief under [the act] by conducting our own independent inquiry into whether the state court was correct as a de novo matter."[13] Because, on the facts presented, "fairminded jurists could disagree over whether [the suspect] was in custody," the Court concluded that the California court's finding was not unreasonable.[14] The Court never decided the issue we must decide in this case, and the Court's conclusion on a different issue is not determinative here.
Both dissenting opinions fail to engage the significant weight of authority discussed in the majority opinion. And both reach for an issue, custody, that was not contested by the State at any point in this case before filing supplemental briefs in this courtperhaps because everyone involved at the trial level seemed to assume that Rogers was in custody. And that was a reasonable assumption. The isolated facts relied upon by the dissenters are simply not compelling when placed in context. I am not persuaded by the dissenters' suggestion that telling Rogers that she was not locked in the interrogation room is equivalent to telling a suspect that he or she is free to end the interrogation and go home.[15] And the fact that Rogers "voluntarily" reported to the sheriff's office is not convincing, because Rogers had to know she did not have much of a choice. She was the sole adult in a house where a mortally injured 6-month-old was found. Any reasonable person in that situation would expect to be a suspect and would not expect the sheriff's officers to just go away if she refused to cooperate. I agree that this fact is part of our analysis, but it does not deserve particular weight, and certainly does not outweigh the length and intensity of the interrogation in this case.

CONCLUSION
The bottom line is that, having viewed the videotaped interrogation, it is apparent to me that Rogers was in custody and that she tried to invoke her right to remain silent, only to have it ignored by her interrogators. I recognize that circumstances such as this can motivate sheriff's officers to assertively pursue a confession in order to expeditiously solve a crime. But regardless what type of crime is committed, the officers are equally bound to carefully follow the law. Here, they did not. They made a mistake. And the trial court relied on the results of that mistake when it admitted into evidence statements made by Rogers after she had unambiguously invoked her right to remain silent. We are dutybound, by the U.S. Constitution *67 and the decisions of the U.S. Supreme Court, to order a new trial.
CONNOLLY and STEPHAN, JJ., join in this concurrence.
HEAVICAN, C.J., dissenting.
I respectfully dissent from the majority's conclusion that Rogers' confession must be suppressed. In my view, Rogers not only failed to unequivocally invoke her Fifth Amendment right to remain silent but, in fact, she had no such right to invoke, as she was not in police custody when officers interviewed her.

I.
Before proceeding to a discussion of whether Rogers was in custody when she confessed, I want to first express my concerns with the majority's discussion of whether Rogers unequivocally invoked the right to remain silent. I have two concerns in this regard.

A.
My first concern is with the standard of review the majority proposes we apply to determine "whether there has been an unambiguous invocation of the right to remain silent or to have counsel."
In State v. Mata,[1] we resolved some confusion regarding the proper standard of review when determining whether a suspect was in custody for Miranda purposes. We held that "findings of fact as to the circumstances surrounding the interrogation are reviewed for clear error" but that the ultimate determination of whether, under those facts, "a reasonable person would have felt that he or she was or was not at liberty to terminate the interrogation and leave is reviewed de novo."[2] In that same opinion, however, we left no doubt that "[r]esolution of ambiguity in the invocation of the constitutional right to remain silent is a question of fact" and that a district court's conclusion on that issue would not be disturbed unless it was "clearly erroneous."[3] We recently reaffirmed that standard of review in State v. Thomas.[4]
Today, the majority jettisons the standard we used in Mata and Thomas on the invocation issue in favor of the two-part standard of review we used in Mata on the custody issue. I am not convinced that we should be so quick to discard Mata and Thomas on that point.
For one, this is not as straightforward a question as the majority's conclusion might suggest. Indeed, the standard of review to apply on the invocation matter is one on which even federal courts of appeal disagree.[5] And I can think of at least one legitimate reason why they might: A de novo standard of review makes sense in the custody context, because a custody determination is made on the basis of facts that are less susceptible to misinterpretation on review. A transcript of trial testimony will normally accurately reveal whether a suspect arrived at the station of his or her own accord; was advised that he or she was not under arrest; was handcuffed, locked in a room, or told to remain *68 in place; or other factors indicative of custody.[6]
But as the majority itself acknowledges, resolving the ambiguity inherent in a suspect's attempted invocation of the right to silence (or to an attorney) depends heavily on matters of context. The suspect's vocal intonation, gestures, or other indicia of emphasis may prove decisive in the invocation inquiry. Yet, these are precisely the sorts of things that a trial court, which has the benefit of live testimony to help bring texture to the police-suspect encounter, is in a better position to determine relative to appellate judges, for whom a cold transcript may be the only glimpse into how the statement in question was presented.
To be sure, as this case shows, some cases will feature a recording of the encounter. In such instances, a trial court has less of an advantage in resolving the invocation issue. But the majority's proposed standard of review makes less sense in cases where no video or audio recording of the interview exists. A de novo standard of review in those cases may increase the likelihood of an inaccurate determination.
There may be other reasons to avoid adopting a de novo standard of review on the invocation issue. But we may never know, because this is an issue that neither party addressed in its briefs to this court. Indeed, Rogers herself assumed that the clearly erroneous standard of review we used in Mata and Thomas still applied to our review of Rogers' attempted invocation of the right to silence. In view of the fact that accurate judicial decisionmaking depends on a vigorous defense and prosecution of the issues involved,[7] I think it would be unwise to unilaterally reach out and resolve this vexing and fundamental issue without the benefit of briefing and argument by counsel. I would, therefore, reserve action on this issue for a day when the advice of counsel will allow us to make a more fully informed decision.

B.
I now turn to whether Rogers successfully invoked her Fifth Amendment right to remain silent. At issue is whether Rogers' statements, "I'm done" and "I'm not talking no more" were sufficiently unequivocal to trigger Rogers' right to silence. We have considered this issue twice in the last 5 years with regard to very similar statements.
In Mata, this court was asked to consider whether statements made by the defendant that he did not "`want to answer no more questions'" and "`I will plead the fifth right now'" were sufficiently unequivocal to invoke the right to remain silent.[8] We held that when "taken in context," those statements "can be read as frustration with particular questions rather than clearly stated intent to end the interview."[9]
In Thomas, this court considered whether Kevin L. Thomas invoked the right to silence when he said, "`I'm done talkin' man,'" during a custodial interrogation.[10] Once again, we held that this statement was more indicative of Thomas' frustration *69 with the officers' questions than "a clear invocation of his right to remain silent."[11]
The language at issue in Mata and Thomas is virtually identical to the language Rogers used here. The statement that the defendant did not "`want to answer no more questions'" from Mata bears a striking resemblance to Rogers' statement "I'm not talking no more," and is far less equivocal than Rogers' bald assertion, "I'm done." Thomas' statement "`I'm done talkin' man,'" is almost a perfect amalgam of Rogers' statements, "I'm done" and "I'm not talking no more." If this language did not trigger the right to remain silent in Mata or Thomas, I fail to see why it does now.
Given the high degree of similarity between the language in those cases and in this case, I question the majority's failure to discuss Mata at all, and only briefly examine Thomas. Instead, the majority relies primarily on cases from a number of jurisdictions outside of Nebraska. While the desire to derive additional insight from other jurisdictions is commendable, we should not rely on such authority in place of our own.
The majority attempts to distinguish Thomas on the basis that the alleged invocation of the right to silence was followed by a question which cast doubt on Thomas' desire to terminate questioning. But our determination that Thomas had not unequivocally invoked his right to remain silent was primarily based on the fact that "Thomas' single statement that he was done talking could be interpreted as a response in frustration to the investigators' unwillingness to believe that [Thomas] was not involved in the crime...."[12]
Only after coming to that conclusion did we note that "Thomas also followed the statement by a question requesting further information...."[13] We regarded that followup question"`[H]ow can ya'll keep on saying I did it[?]'"as a move which, like the assertion itself that he was done talking, "also acted to encourage further dialog" between Thomas and the officers.[14] In other words, Thomas' followup question provided an alternative reason to find that Thomas had not invoked his right to remain silent in addition to the ambiguity inherent in Thomas' initial statement.
Nor, it seems to me, is Thomas' experience as a felon a sufficient reason to distinguish that case from this one. The majority informs us that at the time of his interview, Thomas was "already a convicted felon," whereas Rogers "had no prior experience with the justice system." With these comments, the majority seems to implywithout citing any supporting authoritythat a statement too ambiguous to trigger the right to remain silent for a veteran criminal like Thomas may suffice to invoke the right to remain silent for a suspect with comparatively less criminal experience like Rogers.
But our conclusion that Thomas did not unequivocally invoke his right to remain silent was not made with reference to his experience as a criminal. We simply held that "[h]ad [Thomas] wished to terminate the interview, he could have made his wishes clear."[15] Of course, the same could be said about any suspect who failed to unambiguously invoke his or her right to remain silent.
Moreover, taking Rogers' lack of experience with the criminal justice system into *70 account improperly injects a subjective element into the Miranda inquiry. "To avoid difficulties of proof and to provide guidance to officers conducting interrogations," the inquiry into whether a suspect actually invoked his or her Miranda rights "is an objective [one]."[16] And the U.S. Supreme Court has made clear that "a suspect's experience with law enforcement" has no place in an objective inquiry.[17]
Thus, the question is not whether, in light of his or her experience, the suspect could have more clearly articulated his or her desire to terminate questioning. Rather, the question is whether the words themselves would have led a reasonable officer to conclude that the suspect wanted to cease the interview.[18] By taking Rogers' lack of criminal justice experience into account, the majority undermines the chief advantage of Miranda by "`plac[ing] upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.'"[19]
Context does not help distinguish Thomas either. The context surrounding Thomas' statement further confirms that Rogers did not unequivocally invoke her right to remain silent under our existing precedent. In Thomas, we noted that his alleged invocation of the right to remain silent came after investigators repeatedly refused to believe that Thomas was not involved in the crime. This led us to conclude that Thomas' statement reflected frustration with his inability to convince officers he was telling the truth rather than a desire to terminate questioning.[20] The same conclusion is warranted here.
Like Thomas, Rogers' statements also came after officers repeatedly refused to accept her explanation of how Alex, the child victim, sustained his injuries. The statements were not accompanied by any abrupt gestures, vocal intonation, or anything else that might indicate a firm intent to cut off questioning. Instead, everything about Rogers' tone, brusque responses, and body language suggests that her statements reflect nothing more than irritation with Officer Brenda Wheeler's persistence in making accusations that Rogers had already denied. This is a fact pattern that more closely matches our description of what occurred in Thomas.
In sum, we cannot ignore Mata and Thomas in favor of authority chosen from other jurisdictions. So long as Mata and Thomas remain good law, Rogers' statements fell short of "a clearly stated intent to end the interview."[21] This is particularly so if we use the "clearly erroneous" standard of review employed in those two decisions to measure the district court's findings on ambiguity in the invocation of the constitutional right to remain silent.

II.
The fact that Rogers did not unequivocally invoke her right to remain silent is, in and of itself, reason enough to affirm the trial court's opinion. But the fact that Rogers' "alleged invocation of the Fifth Amendment was not made in the context of a custodial interrogation" provides an *71 additional reason to affirm the trial court's decision.[22] Although this is a closer question than those presented in our recent cases, controlling precedent nonetheless compels the conclusion that Rogers was not in custody when she was interviewed by authorities on December 7, 2005.

A.
At the beginning of its analysis, the majority refers to the six-factor custody inquiry used by the Eighth Circuit in, among other decisions, U.S. v. Axsom.[23] We formally adopted the Axsom analysis in Mata[24] and applied it again in State v. McKinney.[25] To say, however, that we have merely found those six indicia "helpful" in our custody analysis is an understatement.
In Mata, for example, our custody inquiry was based solely on a factor-by-factor analysis of the six Axsom indicia. In McKinney, decided in 2007, our custody inquiry once again consisted entirely of a factor-by-factor analysis under Axsom. These cases suggest that the Axsom factors are not just "helpful" in the custody determination; they are significantly outcome determinative. Indeed, one might even say that although the Axsom factors are not dispositive, they have, at the very least, "been influential in this court's assessment of the totality of the circumstances surrounding an official interrogation."[26]
As set forth in Axsom itself and reemphasized in both Mata and McKinney, the six Axsom indicia are divided into three mitigating and three aggravating factors.[27] The presence of a mitigating factor weighs against a finding that the encounter was custodial in nature, while the presence of an aggravating factor increases the likelihood that a reasonable person would consider themselves in custody.[28] Although the final tally is close, a fair application of the six Axsom factors suggests that Rogers' encounter with law enforcement was noncustodial in nature.

1.
The first mitigating factor asks "whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to [leave], or that the suspect was not considered under arrest."[29] As the majority correctly notes, we cannot ascertain from this record whether officers ever expressly told Rogers that she was not under arrest. Nor do we know if the officers expressly indicated that Rogers was free to leave the sheriff's office. I therefore agree with the majority that the first mitigating factor is not present on this record.
I do think, however, that the record supports the second mitigating factor "whether the suspect possessed unrestrained freedom of movement during *72 questioning."[30] The majority seems to conclude that Rogers did not have that freedom, based on the fact that Rogers "would have had a hard time even standing up while [Deputy] Wheeler was grasping both her hands."
The majority refers to an exchange that occurred roughly 1 ½ hours into questioning. At that point, Rogers began sobbing and announced that Alex sustained his injuries when Rogers fell down the stairs while carrying him. As she made this announcement, Rogers reached for and held Officer Eric Sellers' hands. Wheeler came into the room several minutes later. When she did so, Rogers stood up, held her arms open, hugged Wheeler, and began sobbing. When the two then sat down, they maintained their grip on each others' hands.
The fact that this physical contact was initiated by Rogers herself is significant. Just as a police-suspect encounter is less likely to be custodial when the suspect initiates the meeting,[31] logic suggests that physical contact between an officer and a suspect is less likely to be regarded as a form of restraint if the suspect initiates the contact.
It is equally important to view this contact in its proper context. Actions which may seem indicative of custody in the abstract do not necessarily support a custodial finding when viewed in light of the surrounding circumstances.[32] The contact between Rogers and Wheeler occurred during an emotional point in the interview while Rogers was openly sobbing. This suggests that a reasonable person would have regarded Wheeler's gesture as a reciprocal act of sympathy rather than an act of restraint.
I also question the majority's conclusion that "once the interrogation became more accusatory, Rogers' only exit from the room was continuously blocked by either Sellers or Wheeler sitting very close, knee to knee, in front of her." The position of the video camera in the interview room is such that the parties appear in the very bottom of the frame. This makes it impossible to determine how much space existed between the wall nearest the camera and the chairs where Rogers and the officers were sitting. It is impossible to say, therefore, how much of an egress was left open between that wall and the officers for Rogers to pass through. Accordingly, any assertion that Rogers' path was "blocked" is simply a guess.
Nor is it significant that officers questioned Rogers face-to-face and were seated between her and the door. These facts may have curtailed Rogers' freedom of movement relative to, say, a police-suspect encounter in the public square.[33] But the question is not whether Rogers' freedom of action was limited; the question is whether Rogers' freedom of action was limited "`in any significant way.'"[34] Compared to a persistent police escort, physical act of genuine restraint, or verbal command to remain in a particular place,[35] questioning a suspect face-to-face while positioned between the suspect and the door is an ambiguous act that does not necessarily preclude free movement. It cannot *73 necessarily be said, then, that Rogers was "significantly deprived of [her] freedom of action."[36]
Far from being restrained, the record actually supports the conclusion that Rogers was free to move in and out of the interview room as she chose. As Sellers got up to leave the interview room on one occasion, he paused to note that Rogers may have to let him back in, because the room locked to the outside and he did not have a key. But Sellers informed Rogers that she was neither locked in the room nor expected to remain inside when he immediately added, "So you can get out if you need to."
A suspect's latitude to move out of an interview room at his or her will is "clearly inconsistent with custodial interrogation."[37] Indeed, our decision that officers did not restrain the suspect's freedom of movement in Mata was based on our conclusion that "the door to the interview room was left unlocked and that [an officer] explained to Mata that the door was unlocked and that Mata was free to leave at any time."[38] Accordingly, I believe the second mitigating factor is present on these facts.
There is no real dispute regarding the existence of the third and final mitigating factor, which asks "whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions."[39] It is clear that Rogers voluntarily acquiesced to the interview when, in the majority's words, "Rogers agreed" with the officers' request for an interview and drove with her husband to "the station shortly thereafter."
The majority downplays this fact largely because it was the officers, not Rogers, who suggested the interview. But the third mitigating factor does not express any preference for whether the suspect volunteered to an interview or simply agreed to do so at the request of authorities.[40] Either contingency operates as a mitigating circumstance under this factor.
Indeed, in both Mata and McKinney, the suspects were not only asked to come to the police station, they were both transported there by officers after they agreed to the interview. But that did not stop us from concluding that "all three mitigating indicia [we]re present" in both cases.[41] Given the fact that Rogers drove to the sheriff's office herself, it is difficult to believe a different conclusion is warranted here.
I therefore believe that the third mitigating factor is also present.

2.
Having determined that two of three possible mitigating factors are present here, the next step is to assess the applicability of Axsom's aggravating factors. Those factors are (1) whether strong-arm tactics or deceptive stratagems were used during questioning, (2) whether the atmosphere of the questioning was police dominated, or (3) whether the suspect was placed under arrest at the termination of the proceeding.
*74 The majority does not comment at length on the first aggravating factor except to note that Sellers "told Rogers, deceptively, that Alex was going to be okay, although Sellers knew this to be untrue." (Emphasis supplied.) Sellers' comment may have been inaccurate, but that alone does not indicate the existence of any "deceptive stratagems."[42] Indeed, such ambiguous comments are distinguishable from situations where police attempt to confuse a suspect by confronting the suspect with false evidence of his or her involvement in a crime.[43]
The record also fails to support the existence of strong-arm tactics as that term has been conventionally understood. The officers did not, for example, discuss the potential penalty for Rogers' involvement or make threats about possible sanctions if she failed to cooperate with them.[44] I believe, therefore, that the first aggravating factor is not present on these facts.
It is clear, however, that the second aggravating factor"whether the atmosphere of the questioning was police dominated"[45] is present here. Rogers was questioned by officers in a closed room at the sheriff's office. In Mata, we concluded that when "the interview was conducted at the police station, it is reasonable to conclude that the atmosphere was `police dominated.'"[46]
Finally, the record does not support the third aggravating factor"whether the suspect was placed under arrest at the termination of the proceeding."[47] There is no dispute that Rogers was permitted to return home with her husband after she confessed to officers.
The majority acknowledges this fact but attempts to downplay its significance because "a reasonable person in Rogers' position at the time of her confession would not have believed" that she would be released after the interview. Yet the custody determination is based on how a reasonable person in the suspect's position would have perceived his or her degree of freedom during the encounter.
Nevertheless, the fact remains that we have repeatedly relied on this factor without reservation in past cases.[48] More importantly, the U.S. Supreme Court specifically mentioned this factor as one of several that are relevant to the custody determination.[49] It appears, therefore, that no matter how illogical it may be to consider whether a suspect was allowed to return home at the conclusion of questioning, it is a fact that we are bound to take seriously when resolving whether a suspect was in custody.
Of course, this debate is largely academic. The third aggravating factor is just thatan aggravating factor. As such, it only affects the Axsom calculus if officers did not allow the suspect to go home after his or her interview. Therefore, whether the majority fully acknowledges that Rogers was released or determines "this fact to be of little consequence," it does not change the fact that there are two *75 mitigating factors weighing in favor of a noncustodial encounter, and only one factor weighing against it.
In Mata and McKinney, the tally was three mitigating factors versus one aggravating factor. The difference in those cases was the existence of explicit statements by officers to each suspect informing them that they were not under arrest. I note, however, that in both cases, such information may have been necessary to clarify the status of suspects who, unlike Rogers, did not come to the station of their own accord.
In Mata, the suspect was initially handcuffed and then, after the handcuffs were removed, transported by police to the station house in a police vehicle. Likewise, in McKinney, the "[t]wo investigators drove [the suspect] to Nebraska State Patrol offices for an interview."[50] In such a context, advising a suspect that he or she is not under arrest helps mitigate the presumption of arrest that might be formed when the police transport the suspect to the station. But informing a suspect that he or she is not under arrest is somewhat superfluous where, as here, the suspect drove himself or herself to the station.
In any event, this situation presents us with two mitigating factors and just one aggravating factor. So although a noncustodial finding would be more obvious with some concrete proof that officers expressly informed Rogers she was not under arrest, the balancing test used in Mata and McKinney compels the conclusion that Rogers was not in custody even without such evidence.

B.
As noted above, the custody analyses in Mata and McKinney were predicated on the Axsom factors alone. Nevertheless, in light of the close split in the Axsom factors, I do not quarrel with the majority's suggestion that we consider past cases with similar facts for guidance.
The majority cites State v. Dedrick,[51] a 19-year-old decision from the New Hampshire Supreme Court. Dedrick is similar to this case in many respects and apparently supports the conclusion that Rogers was in custody.
But opinions of other states are not binding on this court, and any number of them may be incorrect interpretations of the Fifth Amendment.[52]Dedrick itself illustrates this point by essentially treating its custody determination as a question of factnot the standard employed by this court (and a standard later rejected by the New Hampshire Supreme Court[53]). Because authority from other, parallel jurisdictions is potentially inaccurate, it would be an exercise in futility to try to match the majority case by case with contradictory precedent from yet another jurisdiction. Instead, resolving this issue of federal constitutional interpretation is perhaps best done by looking to U.S. Supreme Court precedent.
Precedent from the Supreme Court of the United States has two chief advantages over that of the New Hampshire Supreme Court. First, the U.S. Supreme Court's status as the "final arbiter of the United States Constitution"[54] means that its interpretation *76 of the Fifth Amendment is presumptively correct and, therefore, totally reliable. The U.S. Supreme Court's position in our constitutional order also means that we are bound by its precedent. By relying on another state's case in place of U.S. Supreme Court precedent, we not only risk adopting inaccurate law, we may also violate our duty to obey controlling authority. With that said, I note that Yarborough v. Alvarado[55] bears a great resemblance to the facts of this case.
Yarborough featured the interrogation of Michael Alvarado, a 17-year-old suspect in the shooting death of a truckdriver. A month after the shooting, a detective "left word at Alvarado's house and also contacted Alvarado's mother at work with the message that she wished to speak with Alvarado."[56] In response, "Alvarado's parents brought him to the Pico Rivera Sheriff's Station to be interviewed" and "waited in the lobby while Alvarado went... to be interviewed."[57]
As was true in this case, the interview itself took place in a "small interview room" and "lasted about two hours."[58] Alvarado initially denied any involvement in the shooting, only to confess after repeated accusations by the interviewing officer. Finally, "Alvarado's father drove him home" when the interview was over.[59]
Alvarado's confession was admitted at trial, and he was subsequently convicted of second degree murder. On direct appeal, the California Court of Appeal affirmed Alvarado's conviction, finding that he was not in custody when he confessed. The California Supreme Court denied Alvarado's request for review. Alvarado then filed a writ for habeas corpus in the U.S. District Court for the Central District of California, which also found that Alvarado was not in custody when he confessed. The Ninth Circuit reversed on appeal, finding that in light of Alvarado's youth and lack of experience, it was "`unreasonable'" to conclude that a person in Alvarado's position would have felt free to leave.[60] The U.S. Supreme Court granted certiorari to resolve the issue of whether the state court's conclusion that Alvarado was not in custody when he confessed "`involved an unreasonable application' of clearly established law."[61]
In answering that question, the Court began by listing the facts that "weigh against a finding that Alvarado was in custody."[62] Here, the Court noted that "[t]he police did not transport Alvarado to the station or require him to appear at a particular time."[63] Additionally, police did not "threaten [Alvarado] or suggest he would be placed under arrest," but "appealed to his interest in telling the truth and being helpful to a police officer."[64]
The Court also observed that "Alvarado's parents remained in the lobby during the interview, suggesting that the interview would be brief.... In fact ... he and his parents were told that the interview `"was not going to be long."'"[65] On two *77 occasions, the detective "asked Alvarado if he wanted to take a break."[66] Finally, "[a]t the end of the interview, Alvarado went home."[67] The Yarborough Court stated that
these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave. Indeed, a number of the facts echo those of Mathiason, a per curiam summary reversal in which we found it "clear from these facts" that the suspect was not in custody.[68]
Notably, every single mitigating factor mentioned by the Yarborough Court is present here. Officers did not transport Rogers to the station. Instead, they asked her if she would be willing to come in and answer questions, and she came on her own. Nor did officers threaten Rogers. As in Yarborough, the officers merely appealed to her interest in helping authorities by asking her to identify the cause of Alex's injuries so doctors could treat him more effectively. Like Alvarado, Rogers also had family (her husband) waiting for her in the lobby of the sheriff's office during questioning. Rogers and her husband were essentially told the interview would be brief and would take only 20 or 30 minutes. Finally, officers did not merely ask Rogers if she needed to take a break; they actually told Rogers she could get out of the interview room if she needed to.
Of course, the Yarborough Court also acknowledged that "[o]ther facts point in the opposite direction."[69] Here, the Court noted that Alvarado was "interviewed ... at the police station" and that "[t]he interview lasted two hours, four times longer than the 30-minute interview in Mathiason."[70] Also, unlike the officer in Mathiason, the detective "did not tell Alvarado that he was free to leave."[71] Each of these facts, which "weigh in favor of the view that Alvarado was in custody,"[72] are present here as well.
Notably, the Yarborough Court's discussion of aggravating factors lacks even a single reference to the fact that the detective repeatedly confronted Alvarado with evidence of his guilt and expressed her belief that Alvarado was guilty of the crime. This is significant, because the majority's conclusion that Rogers was in custody depends largely on the fact that Rogers was "subjected to aggressive accusatorial interrogation in which she was confronted with substantial evidence to prove her guilty of a crime." But by neglecting to list aggressive accusations among the factors indicative of a custodial encounter, Yarborough suggests that such confrontations have no bearing on the custody determination.
This point was not lost on the dissenting justices in Yarborough. In concluding that Alvarado was in custody, the dissenters, like the majority here, made much of the fact that Alvarado was "confronted with claims that there is strong evidence that he participated in a serious crime."[73] But because this proposition appears in the *78 dissent rather than in Yarborough's majority opinion, it appears this view is not the law.
And while all of the aggravating factors in Yarborough were also present in this case, Yarborough featured several additional indicia of custody that are not present here. For example, "Alvarado was brought to the police station by his legal guardians rather than arriving on his own accord, making the extent of his control over his presence unclear."[74] No similar argument can be made with regard to the fact that Rogers, an adult, came to the sheriff's office with her husband.
In addition, in Yarborough, there was evidence that "Alvarado's parents asked to be present at the interview but were rebuffed, a fact thatif known to Alvarado might reasonably have led someone in Alvarado's position to feel more restricted than otherwise."[75] There is no evidence that Rogers' husband made a similar request in this case.
Finally, I think it significant that unlike Alvarado, Rogers had been to the sheriff's office for a similar interview the day before. Rogers came to the office for an interview on December 6, 2005, and was allowed to return home afterward. The fact that she emerged unscathed from questioning in a police-dominated atmosphere on December 6 would have given a reasonable person in her position much less reason to regard that same atmosphere as an indication of custody during her interview the following day on December 7.
The only other pertinent difference between this case and Yarborough is that Alvarado was questioned by a lone officer, while Rogers was questioned by two officers interchangeably and, at times, simultaneously. But the Yarborough Court did not specifically refer to the fact that Alvarado was questioned by a lone officer when it recounted the various facts that "weigh against a finding that Alvarado was in custody."[76] Moreover, the U.S. Supreme Court has seemed to equate encounters that involve "only one or ... two policemen."[77] Finally, the fact that questioning was conducted by more than one officer was not mentioned as an aggravating factor in either Mata or McKinney. All of this supports the notion that the mere presence of a second officer does not help transform an otherwise noncustodial interrogation into a custodial one.
Ultimately, the Yarborough Court never held one way or another whether Alvarado was in custody. Because "fairminded jurists could disagree over whether Alvarado was in custody,"[78] the Court concluded that the state court's determination that Alvarado was not in custody when he confessed "was [a] reasonable" one.[79] I perceive this comment to mean that the custody determination could have gone either way in Yarborough.
But, again, the scales are not as balanced here. While all of the mitigating factors present in Yarborough exist in this case, Yarborough bore a number of additional indicia of custody that are not present on this record. As a result, the circumstances here provide more support for *79 the conclusion that Rogers' encounter with law enforcement was noncustodial in nature. A comparison with Yarborough therefore confirms what Axsom's balancing test suggested by a 2-to-1 margin that Rogers was not in custody when she confessed to officers on December 7, 2005.

III.
As noted at the outset, this is a close case. Nonetheless, the circumstances compel the conclusion that Rogers not only failed to adequately invoke her Fifth Amendment right to remain silent, she never had that right to begin with, because she was not in police custody. Any contrary determination is at odds with recent precedent from this court and ignores the lessons implicit in controlling authority from the Supreme Court of the United States. On the basis of that authority, I must conclude that Rogers' Fifth Amendment rights were not violated when her confession was offered at trial. I would therefore affirm Rogers' conviction.
MILLER-LERMAN, J., dissenting.
I respectfully dissent from the majority's conclusion that Rogers' confession must be suppressed. I write separately to state that upon review of the proper range of factors and the applicable law, I conclude that Rogers' confession did not take place during a "custodial interrogation." As a result, it need not be suppressed, and because the statement is not the product of a custodial interrogation, an exposition under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), on whether Rogers invoked her right to remain silent is not necessary to the resolution of this case.
We have repeatedly observed as a general matter that warnings under Miranda are required only where there has been a restriction on one's freedom as to render one "in custody." State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003); State v. Brouillette, 265 Neb. 214, 655 N.W.2d 876 (2003). The U.S. Supreme Court has stated:
Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.
(Emphasis in original.) Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Further, we have noted that Miranda rights cannot be invoked outside the context of custodial interrogation. State v. Mata, supra. Given the foregoing, it is unavoidable that the issue of whether an individual is in custody be resolved prior to considering whether the police are under an obligation to honor an invocation of Miranda rights.
The record admittedly fails to show an indepth analysis of the custody issue at the trial level. Nevertheless, the trial court's order states that "the statements of [Rogers] both while not in custody and while in custody were freely and voluntarily made." From this, I believe that the trial court considered and ruled on whether Rogers was in custody and that therefore, such *80 ruling is subject to review on appeal. I further note that subsequent to oral argument of this case, in a supplemental briefing order filed by this court, the parties were directed to file supplemental briefs addressing the issues of Rogers' custody and invocation of her Fifth Amendment rights. The parties filed their supplemental briefs, thus squarely framing the issue of custody for resolution by this court.
Like the majority and the preceding separate dissent, I have considered the custody inquiry under the six factors listed in U.S. v. Axsom, 289 F.3d 496 (8th Cir. 2002), which we applied in State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003), and State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007). Because I agree with the majority that the Axsom factors are "helpful to our analysis" rather than "significantly outcome determinative" as asserted in the preceding dissent, I have also considered other custody-related jurisprudence.
The Axsom factors were derived from U.S. v. Griffin, 922 F.2d 1343 (8th Cir. 1990). Griffin makes clear that the six factors are "merely intended to be representative of those indicia of custody most frequently cited by this and other courts when undergoing the prescribed totality of the circumstances analysis." 922 F.2d at 1349. The list is "decidedly non-exhaustive," and "a particularly strong showing with respect to one factor" may be influential to the custody analysis. Id.
In determining whether an individual is "in custody" at a particular time, the reviewing court must examine the extent of the physical or psychological restraints placed on the individual during questioning in light of whether a "reasonable [person] in the suspect's position would have understood his [or her] situation" to be one of custody. Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). I have therefore considered whether a person in Rogers' situation would have believed his or her freedom of action had been curtailed to "the degree associated with a formal arrest," California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), and whether that belief was reasonable from an objective viewpoint. See, also, Mata, supra. In this regard, I have examined the circumstances surrounding the interrogation and whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. State v. Dallmann, 260 Neb. 937, 621 N.W.2d 86 (2000).
I will not repeat here either the majority's or the preceding dissent's mathematical inventory of the six separate indicators in Axsom, nor will I repeat here an architectural description of the interview room which has been amply provided. The majority and the preceding dissent appear to agree that two of the six factors in Axsom favor a finding that Rogers was not in custody: i.e., Rogers voluntarily acquiesced to official requests to respond to questioning and Rogers was not arrested at the termination of the proceeding. The majority, however, downplays the significance of both factors. The preceding dissent finds that an additional two factors indicate that Rogers was not in custody, including the determination with which I agree that Rogers had unrestrained freedom of movement. For completeness, I note that the majority and preceding dissent appear to agree that two of the six factors favor a finding that Rogers was in custody.
With respect to voluntarily acquiescing to questioning, I find it important that Rogers agreed to the request for an interview and drove with her husband to the sheriff's office for that purpose and possibly a polygraph examination which was *81 suggested by her husband. Rogers had been to the sheriffs office for questioning once before and was not detained. I compare this relative lack of coercion to other defendants who were initially handcuffed and interviewed, but who, under the overall circumstances, we nevertheless determined were not in custody. E.g., Mata, supra.
With respect to the fact that Rogers was not arrested at the end of the proceeding, contrary to the majority view which found this noncustodial fact to be of "little consequence," I find it revealing, because it reflects and is consistent with a strong showing of a noncustodial event. In this regard, I note that it is well settled that an interrogation which occurs at the police station or jailhouse is not necessarily custodial. Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). See U.S. v. Jorgensen, 871 F.2d 725 (8th Cir.1989) (suspect not in custody when questioned at Federal Bureau of Investigation offices).
In assessing the totality of the interview, as compared to the majority opinion, I find it particularly significant that when sheriffs officer Eric Sellers left the room, he explained to Rogers that the door was not locked on the inside and stated that "you can get out if you need to." Although this statement does not explicitly state that Rogers was free to leave, it nonetheless signals two important facts: (1) The door was not locked on the inside and (2) Rogers' movement was not restrained. I believe this statement combined with other noncustodial factors leads to the conclusion that a reasonable person in Rogers' situation would not have believed her freedom was curtailed to the degree associated with a formal arrest and that therefore, the interview was not custodial in nature. Because Rogers' confession was not obtained in a "custodial interrogation," it need not be suppressed. I would affirm.
NOTES
[1] See Neb.Rev.Stat. § 28-707 (Cum. Supp. 2004).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] See, United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).
[4] See id.
[5] State v. Thomas, 267 Neb. 339, 350, 673 N.W.2d 897, 908 (2004).
[6] State v. Mata, 266 Neb. 668, 684, 668 N.W.2d 448, 467 (2003).
[7] See, e.g., State v. Mata, supra note 6 (resolution of ambiguity in invocation of right to remain silent question of fact); State v. Ray, 241 Neb. 551, 489 N.W.2d 558 (1992) (determination that statement made voluntarily not disturbed unless clearly wrong).
[8] See, Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); U.S. v. Walker, 272 F.3d 407 (7th Cir.2001); Beavers v. State, 998 P.2d 1040 (Alaska 2000); People v. Jablonski, 37 Cal.4th 774, 126 P.3d 938, 38 Cal.Rptr.3d 98 (2006); People v. Matheny, 46 P.3d 453 (Colo. 2002); State v. Fields, 265 Conn. 184, 827 A.2d 690 (2003); State v. Buch, 83 Hawai`i 308, 926 P.2d 599 (1996); Light v. State, 547 N.E.2d 1073 (Ind.1989); Gorge v. State, 386 Md. 600, 873 A.2d 1171 (2005); State v. Miller, 573 N.W.2d 661 (Minn. 1998); State v. Cooper, 124 N.M. 277, 949 P.2d 660 (1997); State v. Hyde, 352 N.C. 37, 530 S.E.2d 281 (2000); State v. Acremant, 338 Or. 302, 108 P.3d 1139 (2005); Com. v. Templin, 568 Pa. 306, 795 A.2d 959 (2002); State v. Morato, 619 N.W.2d 655 (S.D.2000); State v. Mabe, 864 P.2d 890 (Utah 1993); Midkiff v. Com., 250 Va. 262, 462 S.E.2d 112 (1995); State v. Singleton, 218 W.Va. 180, 624 S.E.2d 527 (2005); State v. Clappes, 136 Wis.2d 222, 401 N.W.2d 759 (1987); Simmers v. State, 943 P.2d 1189 (Wyo.1997).
[9] See, e.g., State v. Mata, supra note 6; State v. Burdette, 259 Neb. 679, 611 N.W.2d 615 (2000). See, also, U.S. v. Moreno-Flores, 33 F.3d 1164 (9th Cir.1994); People v. Matheny, supra note 8; State v. Spencer, 149 N.H. 622, 826 A.2d 546 (2003); State v. Juarez, 120 N.M. 499, 903 P.2d 241 (N.M.App. 1995).
[10] State v. Fernando-Granados, 268 Neb. 290, 682 N.W.2d 266 (2004).
[11] See, U.S. v. Narvaez-Gomez, 489 F.3d 970 (9th Cir.2007); People v. Platt, 81 P.3d 1060 (Colo.2004); State v. Jaco, 130 Idaho 870, 949 P.2d 1077 (Idaho App.1997); State v. Lockhart, 830 A.2d 433 (Me.2003); State v. Dominguez-Ramirez, 563 N.W.2d 245 (Minn. 1997); State v. Barrera, 130 N.M. 227, 22 P.3d 1177 (2001); State v. Ramirez-Garcia, 141 Ohio App.3d 185, 750 N.E.2d 634 (2001); Quinn v. Com., 25 Va.App. 702, 492 S.E.2d 470 (1997); State v. Jennings, 252 Wis.2d 228, 647 N.W.2d 142 (2002).
[12] See, U.S. v. Rodriguez, 518 F.3d 1072 (9th Cir.2008); U.S. v. Uribe-Galindo, 990 F.2d 522 (10th Cir.1993); Munson v. State, 123 P.3d 1042 (Alaska 2005); People v. Quezada, 731 P.2d 730 (Colo.1987); Cuervo v. State, 967 So.2d 155 (Fla.2007); People v. Howerton, 335 Ill.App.3d 1023, 782 N.E.2d 942, 270 Ill.Dec. 383 (2003); State v. Grant, 939 A.2d 93 (Me.2008); People v. Glover, 87 N.Y.2d 838, 661 N.E.2d 155, 637 N.Y.S.2d 683 (1995); State v. Holcomb, 213 Or.App. 168, 159 P.3d 1271 (2007); Com. v. Redmond, 264 Va. 321, 568 S.E.2d 695 (2002); State v. Jennings, supra note 11. But see, U.S. v. Ferrer-Montoya, 483 F.3d 565 (8th Cir.2007); People v. Musselwhite, 17 Cal.4th 1216, 954 P.2d 475, 74 Cal.Rptr.2d 212 (1998); State v. Johnson, 463 N.W.2d 527 (Minn.1990); Mayes v. State, 8 S.W.3d 354 (Tex.App.1999).
[13] See, e.g., People v. Quezada, supra note 12.
[14] See, United States v. Bajakajian, supra note 3; Thompson v. Keohane, supra note 3.
[15] Withrow v. Williams, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). See, also, e.g., State v. Ball, 271 Neb. 140, 710 N.W.2d 592 (2006).
[16] Thompson v. Keohane, supra note 3, 516 U.S. at 107, 116 S.Ct. 457, quoting Miranda v. Arizona, supra note 2.
[17] Miranda v. Arizona, supra note 2.
[18] Dickerson v. United States, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), quoting Miranda v. Arizona, supra note 2.
[19] Withrow v. Williams, supra note 15, 507 U.S. at 689, 113 S.Ct. 1745.
[20] See, e.g., Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), overruled in part on other grounds, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). See, also, Dickerson v. United States, supra note 18.
[21] Miranda v. Arizona, supra note 2, 384 U.S. at 457, 86 S.Ct. 1602.
[22] Dickerson v. United States, supra note 18.
[23] Miranda v. Arizona, supra note 2, 384 U.S. at 458, 86 S.Ct. 1602.
[24] Id., 384 U.S. at 467, 86 S.Ct. 1602.
[25] Id., 384 U.S. at 451, 86 S.Ct. 1602.
[26] Id., 384 U.S. at 450, 86 S.Ct. 1602.
[27] Id., 384 U.S. at 451, 86 S.Ct. 1602.
[28] Id., 384 U.S. at 455, 86 S.Ct. 1602.
[29] Id.
[30] Id., 384 U.S. at 457, 86 S.Ct. 1602.
[31] Id., 384 U.S. at 473-74, 86 S.Ct. 1602.
[32] Id., 384 U.S. at 474, 86 S.Ct. 1602.
[33] Id.
[34] Id., 384 U.S. at 445, 86 S.Ct. 1602.
[35] See, e.g., Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); State v. Pettit, 227 Neb. 218, 417 N.W.2d 3 (1987).
[36] Michigan v. Mosley, supra note 35.
[37] Davis v. United States, 512 U.S. 452, 460, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
[38] Id.
[39] See In re Interest of Frederick C., 8 Neb. App. 343, 594 N.W.2d 294 (1999). See, also, Davis v. United States, supra note 37; U.S. v. Mikell, 102 F.3d 470 (11th Cir.1996); State v. Walker, 129 Wash.App. 258, 118 P.3d 935 (2005).
[40] Michigan v. Mosley, supra note 35. See Davis v. United States, supra note 37.
[41] Reimers-Hild v. State, 274 Neb. 438, 741 N.W.2d 155 (2007).
[42] Supplemental brief for appellee at 8.
[43] Dickerson v. United States, supra note 18, 530 U.S. at 433, 120 S.Ct. 2326 (emphasis supplied).
[44] Dickerson v. United States, supra note 18.
[45] See id.
[46] See, State v. Mata, supra note 6. See, also, e.g., Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); State v. Burdette, supra note 9.
[47] State v. Rodriguez, 272 Neb. 930, 726 N.W.2d 157 (2007).
[48] Thompson v. Keohane, supra note 3, 516 U.S. at 112, 116 S.Ct. 457, quoting Miller v. Fenton, supra note 8. Accord Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).
[49] Supplemental brief for appellee at 8.
[50] See, e.g., Yarborough v. Alvarado, supra note 48; State v. Smith, 13 Neb.App. 404, 693 N.W.2d 587 (2005).
[51] See, e.g., U.S. v. Moreno-Flores, supra note 9; State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007); State v. Mata, supra note 6; State v. Burdette, supra note 9; People v. Matheny, supra note 8; State v. Spencer, supra note 9; State v. Juarez, supra note 9. See, also, Yarborough v. Alvarado, supra note 48; Thompson v. Keohane, supra note 3.
[52] Stansbury v. California, 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).
[53] Thompson v. Keohane, supra note 3, 516 U.S. at 112, 116 S.Ct. 457.
[54] Id.
[55] See State v. McKinney, supra note 51. Accord Yarborough v. Alvarado, supra note 48.
[56] Kaupp v. Texas, 538 U.S. 626, 632, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003).
[57] See Annot., 29 A.L.R.6th 1 (2007).
[58] State v. Mata, supra note 6.
[59] U.S. v. Axsom, 289 F.3d 496 (8th Cir.2002).
[60] Oregon v. Mathiason, supra note 46, 429 U.S. at 495, 97 S.Ct. 711.
[61] Id.
[62] See State v. Pontbriand, 178 Vt. 120, 878 A.2d 227 (2005).
[63] 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(f) at 750-51 (3d ed.2007).
[64] State v. Dedrick, 132 N.H. 218, 564 A.2d 423 (1989), abrogated in part on other grounds, State v. Spencer, supra note 9.
[65] Id. at 225, 564 A.2d at 427.
[66] Id.
[67] See, Stansbury v. California, supra note 52; U.S. v. Mittel-Carey, 456 F.Supp.2d 296 (D.Mass.2006); People v. Horn, 790 P.2d 816 (Colo. 1990); Cotton v. State, 901 So.2d 241 (Fla.App.2005); People v. Johnson, 91 A.D.2d 327, 458 N.Y.S.2d 775 (1983); State v. Evans, 354 S.C. 579, 582 S.E.2d 407 (2003). Compare, People v. Downer, 192 Colo. 264, 557 P.2d 835 (1976); State v. Pitts, 936 So.2d 1111 (Fla.App.2006); Burton v. State, 32 Md. App. 529, 363 A.2d 243 (1976); Com. v. Mayfield, 398 Mass. 615, 500 N.E.2d 774 (1986); Sandifer v. State, No. 89,729, 2004 WL 944021 (Kan.App. Apr. 30, 2004) (unpublished disposition listed in table of "Decisions Without Published Opinions" at 88 P.3d 807 (Kan.App.2004)).
[68] See, State v. McKinney, supra note 51; State v. Saltzman, 224 Neb. 74, 395 N.W.2d 530 (1986). See, also, U.S. v. Galceran, 301 F.3d 927 (8th Cir.2002); Burket v. Angelone, 208 F.3d 172 (4th Cir.2000); U.S. v. Fazio, 914 F.2d 950 (7th Cir.1990); Wilson v. Fairman, 166 Fed.Appx. 267 (9th Cir.2006); U.S. v. Hemmings, 64 Fed.Appx. 68 (9th Cir.2003); Betts v. State, 799 P.2d 325 (Alaska App. 1990); State v. Turner, 267 Conn. 414, 838 A.2d 947 (2004); Loredo v. State, 836 So.2d 1103 (Fla.App.2003); McAllister v. State, 270 Ga. 224, 507 S.E.2d 448 (1998); People v. Urban, 196 Ill.App.3d 310, 553 N.E.2d 740, 143 Ill.Dec. 33 (1990); Luna v. State, 788 N.E.2d 832 (Ind.2003); State v. Boldridge, 274 Kan. 795, 57 P.3d 8 (2002); Allen v. State, 158 Md.App. 194, 857 A.2d 101 (2004); Sullivan v. State, 585 N.W.2d 782 (Minn. 1998); State v. Barden, 356 N.C. 316, 572 S.E.2d 108 (2002); State v. Roble-Baker, 340 Or. 631, 136 P.3d 22 (2006); State v. Marini, 638 A.2d 507 (R.I.1994); State v. Davis, 735 S.W.2d 854 (Tenn.Crim.App.1987); State v. Pontbriand, supra note 62.
[69] See, U.S. v. Rodriguez, supra note 12; U.S. v. Uribe-Galindo, supra note 12; Munson v. State, supra note 12; People v. Quezada, supra note 12; Cuervo v. State, supra note 12; People v. Howerton, supra note 12; State v. Grant, supra note 12; State v. Holcomb, supra note 12; Com. v. Redmond, supra note 12; State v. Jennings, supra note 11.
[70] See id. See, also, generally, Thompson v. Keohane, supra note 3.
[71] See, e.g., Davis v. United States, supra note 37; Robinson v. State, 373 Ark. 305, ___ S.W.3d ___ (2008) (Glaze, J., dissenting); People v. Arroya, 988 P.2d 1124 (Colo.1999); State v. Day, 619 N.W.2d 745 (Minn.2000); People v. Douglas, 8 A.D.3d 980, 778 N.Y.S.2d 622 (2004); State v. Tuttle, 650 N.W.2d 20 (S.D.2002).
[72] Connecticut v. Barrett, 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (emphasis omitted), quoting Miranda v. Arizona, supra note 2.
[73] Michigan v. Mosley, supra note 35, 423 U.S. at 103-04, 96 S.Ct. 321.
[74] State v. Thomas, supra note 5; State v. Mata, supra note 6; State v. LaChappell, 222 Neb. 112, 382 N.W.2d 343 (1986).
[75] See, e.g., Davis v. United States, supra note 37; Robinson v. State, supra note 71 (Glaze, J., dissenting); People v. Arroya, supra note 71; State v. Day, supra note 71; State v. Tuttle, supra note 71.
[76] Davis v. United States, supra note 37, 512 U.S. at 460, 462, 114 S.Ct. 2350.
[77] See, Davis v. United States, supra note 37; Abela v. Martin, 380 F.3d 915 (6th Cir.2004); Robinson v. State, supra note 71; People v. Arroya, supra note 71; State v. Tuttle, supra note 71. See, also, Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).
[78] People v. Arroya, supra note 71. See, also, People v. Glover, supra note 12.
[79] Id.
[80] See People v. Pierce, 223 Ill.App.3d 423, 430, 585 N.E.2d 255, 260, 165 Ill.Dec. 859, 864 (1991).
[81] See, e.g., Davis v. United States, supra note 37; Clark v. Murphy, 331 F.3d 1062 (9th Cir.2003); Mohn v. Bock, 208 F.Supp.2d 796 (E.D.Mich.2002).
[82] Com. v. Almonte, 444 Mass. 511, 517, 829 N.E.2d 1094, 1099 (2005) (emphasis supplied), overruled in part on other grounds, Com. v. Carlino, 449 Mass. 71, 865 N.E.2d 767 (2007).
[83] Id. at 519, 829 N.E.2d at 1101.
[84] See, Gamble v. State, 791 So.2d 409 (Ala. Crim.App.2000); Denny v. State, 617 So.2d 323 (Fla.App.1993); State v. McCorkendale, 267 Kan. 263, 979 P.2d 1239 (1999); State v. Birth, 37 Kan.App.2d 753, 158 P.3d 345 (2007). See, also, State v. Thomas, supra note 5.
[85] Denny v. State, supra note 84, 617 So.2d at 324.
[86] State v. McCorkendale, supra note 84, 267 Kan. at 273, 979 P.2d at 1247.
[87] See, U.S. v. Al-Muqsit, 191 F.3d 928 (8th Cir. 1999), vacated in part on other grounds, U.S. v. Logan, 210 F.3d 820 (8th Cir.2000); State v. Bieker, 35 Kan.App.2d 427, 132 P.3d 478 (2006); Com. v. Leahy, 445 Mass. 481, 838 N.E.2d 1220 (2005); State v. Ganpat, 732 N.W.2d 232 (Minn.2007); State v. Holcomb, supra note 12; State v. Sabetta, 680 A.2d 927 (R.I. 1996); Calderon-Hernandez v. Trombley, No. 06-CV-11665, 2007 WL 4181274 (E.D.Mich. Nov. 27, 2007) (unpublished opinion).
[88] U.S. v. Thomas, 358 F.Supp.2d 1100 (M.D.Ala.2005); Centobie v. State, 861 So.2d 1111 (Ala.Crim.App.2001); State v. Bradshaw, 193 W.Va. 519, 457 S.E.2d 456 (1995); State v. Wright, 196 Wis.2d 149, 537 N.W.2d 134 (Wis.App. 1995). Compare, Cuervo v. State, supra note 12; Almeida v. State, 737 So.2d 520 (Fla.1999); People v. Aldridge, 79 Ill.2d 87, 402 N.E.2d 176, 37 Ill.Dec. 286 (1980); State v. Deases, 518 N.W.2d 784 (Iowa 1994); Freeman v. State, 158 Md.App. 402, 857 A.2d 557 (2004); State v. Jobe, 486 N.W.2d 407 (Minn. 1992); People v. Brown, 266 A.D.2d 838, 700 N.Y.S.2d 605 (1999).
[89] U.S. v. Thomas, supra note 88; State v. Williams, 535 N.W.2d 277 (Minn. 1995). See, also, State v. Day, supra note 71.
[90] See, Smith v. Illinois, supra note 77; Anderson v. Terhune, 516 F.3d 781 (9th Cir. 2008).
[91] Mayes v. State, supra note 12, 8 S.W.3d at 359.
[92] U.S. v. Stepherson, 152 Fed.Appx. 904 (11th Cir.2005); State v. Thomas, supra note 5; State v. Pitts, supra note 67; State v. Whipple, 134 Idaho 498, 5 P.3d 478 (Idaho App. 2000); Haviland v. State, 677 N.E.2d 509 (Ind.1997); Furnish v. Com., 95 S.W.3d 34 (Ky.2002); State v. Jones, 333 Mont. 294, 142 P.3d 851 (2006); People v. Lowin, 36 A.D.3d 1153, 827 N.Y.S.2d 782 (2007); State v. Jackson, 107 Ohio St.3d 300, 839 N.E.2d 362 (2006). Compare State v. Astello, 602 N.W.2d 190 (Iowa App.1999).
[93] State v. Thomas, supra note 5, 267 Neb. at 350, 673 N.W.2d at 908.
[94] Id.
[95] Id.
[96] Id.
[97] Anderson v. Terhune, supra note 90, 516 F.3d at 784.
[98] State v. Goetsch, 186 Wis.2d 1, 6, 519 N.W.2d 634, 636 (Wis.App.1994).
[99] Com. v. King, 34 Mass.App. 466, 468, 612 N.E.2d 690, 691 (1993).
[100] People v. Douglas, supra note 71, 8 A.D.3d at 980, 778 N.Y.S.2d at 623. Compare State v. McCorkendale, supra note 84.
[101] Mayes v. State, supra note 12, 8 S.W.3d at 357.
[102] Id.
[103] Mayes v. State, supra note 12.
[104] State v. Kramer, No. C5-00-1195, 2001 WL 604955 at *8 (Minn.App. May 25, 2001) (unpublished opinion). See, also, State v. Sawyer, 561 So.2d 278 (Fla.App.1990).
[105] See, e.g., State v. Astello, supra note 92; U.S. v. Thurman, No. 06-CR-005, 2006 WL 1049541 (E.D.Wis. April 18, 2006) (unpublished opinion).
[106] State v. Thomas, supra note 5.
[107] See, Davis v. United States, supra note 37; People v. Arroya, supra note 71.
[108] Michigan v. Mosley, supra note 35.
[109] Id.
[110] See Arizona v. Fulminante, supra note 8, 499 U.S. at 310, 111 S.Ct. 1246.
[111] Id.; Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).
[112] See, State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007); State v. Canady, 263 Neb. 552, 641 N.W.2d 43 (2002).
[113] See, Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); State v. Leger, 936 So.2d 108 (La.2006); Commonwealth v. Hosey, 368 Mass. 571, 334 N.E.2d 44 (1975).
[114] See, e.g., State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007).
[115] Id.
[116] State v. Sommer, 273 Neb. 587, 731 N.W.2d 566 (2007).
[1] State v. Thomas, 267 Neb. 339, 673 N.W.2d 897 (2004).
[2] State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003).
[3] See, e.g., Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); United States v. Bajakajian, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).
[4] See, brief for appellant at 3; brief for appellee at 7.
[5] See brief for appellee at 7.
[6] Mata, supra note 2.
[7] See id. at 680, 668 N.W.2d at 464.
[8] Thomas, supra note 1.
[9] Id. at 350, 673 N.W.2d at 908.
[10] See U.S. v. Axsom, 289 F.3d 496 (8th Cir. 2002).
[11] Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).
[12] 28 U.S.C. §§ 2241 to 2255 (2000).
[13] Alvarado, supra note 11, 541 U.S. at 665, 124 S.Ct. 2140 (emphasis in original).
[14] Id., 541 U.S. at 664, 124 S.Ct. 2140.
[15] Compare Mata, supra note 2.
[1] State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003).
[2] Id. at 679, 668 N.W.2d at 464.
[3] Id. at 684, 668 N.W.2d at 467.
[4] State v. Thomas, 267 Neb. 339, 673 N.W.2d 897 (2004).
[5] See, e.g., U.S. v. Rodriguez, 518 F.3d 1072 (9th Cir.2008) (de novo); U.S. v. Uribe-Galindo, 990 F.2d 522 (10th Cir.1993) (same). But see, U.S. v. Ferrer-Montoya, 483 F.3d 565 (8th Cir.2007) (clearly erroneous); Goodwin v. Johnson, 224 F.3d 450 (5th Cir.2000) (same).
[6] See Mata, supra note 1.
[7] See Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (Souter, J., concurring).
[8] Mata, supra note 1, 266 Neb. at 680, 668 N.W.2d at 464.
[9] Id. at 684, 668 N.W.2d at 467.
[10] Thomas, supra note 4, 267 Neb. at 350, 673 N.W.2d at 908.
[11] Id.
[12] Id. (emphasis supplied).
[13] Id. (emphasis supplied).
[14] Id. (emphasis supplied).
[15] Id.
[16] Davis v. United States, 512 U.S. 452, 458-59, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
[17] Yarborough v. Alvarado, 541 U.S. 652, 667, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).
[18] See Davis, supra note 16.
[19] Berkemer v. McCarty, 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), quoting People v. Rodney P. (Anonymous), 21 N.Y.2d 1, 233 N.E.2d 255, 286 N.Y.S.2d 225 (1967).
[20] Thomas, supra note 4.
[21] See id.
[22] Mata, supra note 1, 266 Neb. at 684, 668 N.W.2d at 467.
[23] U.S. v. Axsom, 289 F.3d 496 (8th Cir.2002).
[24] Mata, supra note 1.
[25] State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007).
[26] See U.S. v. Griffin, 922 F.2d 1343, 1349 (8th Cir.1990).
[27] See, Axsom, supra note 23. See, also, McKinney, supra note 25; Mata, supra note 1.
[28] See, Axsom, supra note 23; McKinney, supra note 25; Mata, supra note 1.
[29] McKinney, supra note 25, 273 Neb. at 364, 730 N.W.2d at 91.
[30] Id. at 364-65, 730 N.W.2d at 91.
[31] Griffin, supra note 26.
[32] See, e.g., Davis v. Allsbrooks, 778 F.2d 168 (4th Cir.1985).
[33] See, e.g., Berkemer, supra note 19.
[34] Oregon v. Mathiason, 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) (emphasis supplied), quoting Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[35] See Griffin, supra note 26.
[36] See California v. Beheler, 463 U.S. 1121, 1123, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).
[37] U.S. v. Jorgensen, 871 F.2d 725, 729 (8th Cir.1989).
[38] Mata, supra note 1, 266 Neb. at 680, 668 N.W.2d at 464.
[39] McKinney, supra note 25, 273 Neb. at 365, 730 N.W.2d at 91.
[40] Id. See, also, Axsom, supra note 23; Mata, supra note 1.
[41] McKinney, supra note 25, 273 Neb. at 365, 730 N.W.2d at 92. See, also, Mata, supra note 1.
[42] McKinney, supra note 25, 273 Neb. at 365, 730 N.W.2d at 91.
[43] United States v. Dockery, 736 F.2d 1232 (8th Cir.1984), noted in Griffin, supra note 26.
[44] See, e.g., U.S. v. Beraun-Panez, 812 F.2d 578 (9th Cir.1987).
[45] McKinney, supra note 25, 273 Neb. at 365, 730 N.W.2d at 91.
[46] Mata, supra note 1, 266 Neb. at 683, 668 N.W.2d at 466.
[47] McKinney, supra note 25, 273 Neb. at 365, 730 N.W.2d at 91.
[48] See, id.; Mata, supra note 1.
[49] See Yarborough, supra note 17.
[50] McKinney, supra note 25, 273 Neb. at 363, 730 N.W.2d at 90.
[51] State v. Dedrick, 132 N.H. 218, 564 A.2d 423 (1989).
[52] See, e.g., Berkemer, supra note 19.
[53] State v. Spencer, 149 N.H. 622, 826 A.2d 546 (2003).
[54] Arizona v. Evans, 514 U.S. 1, 9, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).
[55] Yarborough, supra note 17.
[56] Id., 541 U.S. at 656, 124 S.Ct. 2140.
[57] Id.
[58] Id.
[59] Id., 541 U.S. at 658, 124 S.Ct. 2140.
[60] Id., 541 U.S. at 660, 124 S.Ct. 2140.
[61] Id., 541 U.S. at 663, 124 S.Ct. 2140, quoting 28 U.S.C. § 2254(d)(1) (2000).
[62] Id., 541 U.S. at 664, 124 S.Ct. 2140.
[63] Id.
[64] Id.
[65] Id.
[66] Id.
[67] Id.
[68] Id., 541 U.S. at 664-65, 124 S.Ct. 2140, quoting Mathiason, supra note 34.
[69] Id., 541 U.S. at 665, 124 S.Ct. 2140.
[70] Id.
[71] Id.
[72] Id.
[73] Id., 541 U.S. at 671, 124 S.Ct. 2140 (Breyer, J., dissenting; Stevens, Souter, and Ginsberg, JJ., join).
[74] Id., 541 U.S. at 665, 124 S.Ct. 2140.
[75] Id.
[76] Id., 541 U.S. at 664, 124 S.Ct. 2140.
[77] Berkemer, supra note 19, 468 U.S. at 438, 104 S.Ct. 3138.
[78] Yarborough, supra note 17, 541 U.S. at 664, 124 S.Ct. 2140.
[79] Id., 541 U.S. at 665, 124 S.Ct. 2140.