IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF GEM M.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF GEM M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

GEM M., APPELLANT.


Filed April 14, 2020.    No. A-19-701.


Appeal from the Separate Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Affirmed.

Joe Nigro, Lancaster County Public Defender, and Amy J. Peters for appellant.

Patrick F. Condon, Lancaster County Attorney, and Danielle Kerr for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

INTRODUCTION

Gem M. appeals from an order of adjudication by the Separate Juvenile Court of Lancaster County finding that he was a juvenile as defined by Neb. Rev. Stat. § 43-247(1) (Reissue 2016). Gem argues that the juvenile court erred in overruling his motion to suppress evidence and statements obtained by law enforcement officials on the basis that his Fourth Amendment right against unreasonable searches and seizures and Fifth Amendment privilege against compelled self-incrimination were violated. For the reasons that follow, we affirm.

- 1 -

## BACKGROUND

Gem, a juvenile, was adjudicated for possession of drug paraphernalia in violation of Neb. Rev. Stat. § 28-441 (Cum. Supp. 2018). The adjudication was the result of a petition filed by the State, alleging that Gem had violated § 28-441 by possessing, with the intent to use, drug paraphernalia to manufacture, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance.

Prior to the adjudication hearing, Gem filed a motion to suppress evidence and statements obtained as a result of the warrantless stop and search of his person on the date alleged in the State's petition. A hearing was held on Gem's motion to suppress on April 24, 2019.

At the hearing, the State called Officer Shane Alesch with the Lincoln Police Department (LPD). Alesch testified that he regularly receives training on identifying suspects and drugs or drug paraphernalia. Alesch has been a police officer since May 1997, approximately 23 years.

Alesch testified that he was dispatched to 3111 North Hill Road in Lincoln, Nebraska, on October 30, 2018, after receiving a call for a possible burglary in progress. He testified that the call came out at 11:22 a.m. and he arrived on scene within a few minutes. The call stemmed from a report by a resident at the address that they had heard scraping on the door and believed someone was trying to break in. The witness observed the individual take off running to the west. The only description of the suspect provided was that the suspect was wearing a gray hoodie or sweatshirt.

When Alesch arrived on scene, he observed one individual in the area walking to the north. He testified that the individual was approximately 75 yards from the apartment building. At that point, Alesch got out of his cruiser, made contact with the individual, and asked him what he was doing. The individual responded that he was on his way to North Star High School (North Star). At that point, Alesch identified the individual from his student I.D. as Gem.

Alesch testified that after he identified the individual as Gem, he asked Gem if he could pat him down. Gem responded "yes" and Alesch conducted a pat-down search. During the pat-down, Alesch felt a hard object in Gem's left front pocket and, from his training and experience, determined the object to be a narcotics pipe. Alesch asked Gem if the object was a "drug pipe" and Gem responded "yes." Alesch then removed the pipe and Gem stated that it had come from a friend.

Alesch testified that he initially approached Gem because he was the only party within the area after responding to the possible burglary call, and because Gem was wearing a gray sweatshirt or hoodie, matching the reporting party's description of the suspect. Gem denied any involvement in the possible burglary and stated that he was coming from a "Dollar General" store and on his way back to North Star.

Alesch did not recall Gem ever requesting to leave or end the encounter, nor telling Gem that he was not free to leave. Alesch did not read *Miranda* warnings to Gem due to still being in the early stages of the burglary investigation. He testified that the pat-down was conducted for his safety, to determine whether Gem had any weapons on his person. Alesch did not have reason to believe that Gem did not freely consent to the search, nor that Gem was unwilling to talk to him.

On cross-examination, Alesch estimated that three other officers responded to the scene where he had stopped Gem. He testified that all of the officers were identifiable as law enforcement

and arrived in marked police cruisers. He further testified that he believed Gem was wearing a backpack at the time, but had no visible weapons or burglary tools. He also conceded that he had not witnessed Gem commit any crime.

Alesch indicated that, upon arriving at the scene, he parked his police cruiser approximately 20 yards in front of Gem. Alesch testified that Gem cooperated by waiting for him while he spoke to other officers arriving at the scene. Alesch was unable to say for certain whether he had asked Gem to identify himself and explain what he was doing in the area before or after the other officers had arrived. He did not recall Gem indicating that he was attempting to catch a bus at North Star when he was stopped. He also could not say with certainty whether the pat-down of Gem occurred prior to the other officers leaving the scene.

Alesch testified that he did not specifically advise Gem that he did not have to agree to the pat-down. No weapons were discovered on Gem during the pat-down. Alesch further testified that he did not advise Gem of his *Miranda* rights prior to asking whether the object in his pocket was a "smoking" or "drug" pipe.

The juvenile parent notification and referral form indicated that Alesch made phone contact with Gem's mother at 11:58 a.m. He recalled making the phone call while still at the scene, or shortly thereafter. He testified that the entire encounter with Gem lasted "very close to a half hour."

Alesch testified that the initial dispatch call was made at 11:22 a.m. His report indicated 11:41 a.m. as the approximate time of the incident. Alesch acknowledged that Officer Denny, the primary responding officer on the burglary call, did not mention the paraphernalia in his incident report. Alesch testified that he located the pipe "fairly into the process" of his contact with Gem. Alesch testified that he reported 11:42 a.m. as the time Gem was ultimately cited.

On redirect examination, Alesch testified that it is standard practice to conduct a search for officer safety to determine whether an individual is possessing weapons or other objects of that nature that are not visible. He indicated that, due to the safety concerns, the pat-down would have occurred within the first few minutes of his contact with Gem.

After the conclusion of Alesch's testimony, the State rested its presentation of evidence on the motion to suppress. Gem took the stand in his own defense.

Gem testified that he recalled three officers, including Alesch, being present on the October 30 incident where he was stopped. He testified that Alesch pulled up and parked his police cruiser approximately 15 yards directly in front of him, blocking the path he had been walking. Gem recalled Alesch asking him to remain where he was, which he did. Gem testified that after asking him to stay put, Alesch went and spoke with another officer at the scene before returning to speak with him.

Once Alesch returned, he asked Gem about his identity and what he was doing in the area. Gem explained that he was on his way back to North Star from a nearby Dollar General in order to catch a bus to his class at Southeast Community College (SCC). Gem testified that he told Alesch "multiple times" that he was trying to catch the bus. Gem also indicated that he told Alesch that he was running late, but nevertheless stayed put and cooperated.

Gem estimated he had been at the scene for "a good 30 to 40 minutes" before he was searched. He expressly disputed Alesch's testimony that the search had taken place immediately upon contact. According to Gem, the search did not take place until after the other law enforcement

had already completely left the area near the apartment complex. Gem also testified that he asked whether he could leave three or four times but was told to wait until the officers could "figure out what [was] going on with the situation." Gem testified that each time he asked whether he could leave he explained that he was running late to catch the bus. Gem noted that he did not feel as though he was free to leave at any point before or during the search.

Gem testified that after the other two officers left he believed he was cleared of any suspicion regarding the burglary. Gem again asked Alesch if he was free to leave, but again was told to stay put while Alesch "figure[d] things out."

Gem testified that when Alesch asked him whether he would permit him to conduct a search of his person Gem responded that he was busy and had to go. Gem specifically denied consenting or agreeing to the search. Instead, Gem recalled Alesch stating that he was cleared of any suspicion regarding the burglary case, but nonetheless was asked by Alesch to submit to a search.

After Alesch conducted the pat-down, he asked Gem whether the object in his pocket was a "smoking pipe." Gem testified that Alesch never informed him that he did not have to speak to him, nor that he did not have to agree to the search. Gem once again denied giving permission to Alesch to conduct the search.

Gem testified that after the search, and upon leaving the scene, he immediately made a phone call to his mother. Gem testified that his mother had already been informed of the incident by the time he called her. Gem estimated that it was approximately 12:12 p.m. by the time he called his mother, due to the fact he had already missed his bus to his class. He estimated that from the time law enforcement arrived, until he was free to leave, was approximately 50 minutes to an hour.

On cross-examination, Gem testified that he believed his bus was scheduled for 11:40 a.m. Gem clarified that when he saw the bus leave North Star he was still being questioned by Alesch and was not yet told he was free to leave. He testified that the search occurred "in the last ten minutes" of his encounter with Alesch at around 11:50 a.m. Gem testified that he was finally free to leave approximately ten minutes after the search took place, around noon.

Gem testified that as soon as Alesch stopped him he was informed that there had been a possible attempted burglary involving someone wearing a gray jacket and that he was told to stay put until the officers could confirm he was not involved. He testified that a second law enforcement officer arrived five to seven minutes after Alesch.

On redirect examination, Gem clarified that he did inform Alesch that he did not wish to be searched. Nevertheless, Alesch proceeded with the search and Gem cooperated. Gem did not feel as though he could physically refuse the search, so he ultimately cooperated. Nevertheless, he testified that he never gave explicit affirmative consent to the search.

After the conclusion of Gem's testimony, the defense called Gem's mother, Holly, to testify. Holly testified that on October 30, 2018, she received a phone call from Alesch regarding the incident involving her son. Holly testified that Alesch asked her whether Gem was on his way to catch a bus to SCC and she confirmed that he was.

After Holly's testimony, Gem's attorney rested her presentation of evidence on the motion to suppress. The State presented a closing argument, contending that Gem consented to the search

of his person. In the alternative, the State argued that there was reasonable suspicion that Gem was involved in the burglary and the pat-down was therefore warranted on the grounds of officer safety.

Gem's attorney presented a closing argument on the motion to suppress, arguing that Alesch violated Gem's constitutional right against unreasonable searches and seizures and privilege against compelled self-incrimination. Gem's attorney first argued that Gem had been "seized" within the meaning of the Fourth Amendment, that such was unreasonable, and any evidence obtained as a result was fruit of the unlawful detention. Gem's attorney next argued that even if the stop did not amount to a "seizure" under the Fourth Amendment, it exceeded the boundaries of a permissible "*Terry* Stop." Gem's attorney also argued that Gem did not knowingly and voluntarily consent to a search of his person. Finally, Gem's attorney argued that any statements solicited from Gem should be suppressed as a violation of his Fifth and Fourteenth Amendment privilege against compelled self-incrimination.

At the conclusion of closing arguments, the court took the matter under advisement. On May 3, 2019, the juvenile court issued an order overruling Gem's motion to suppress both the physical evidence and statements made by Gem in the course of the stop and search.

The juvenile court first found that there was a lawful basis to stop Gem as an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) based on Gem's proximity in time and location to the possible burglary in-progress call that had come in minutes earlier. The court found that Alesch had "specific and articulable facts sufficient to give rise to reasonable suspicion that [Gem], at the time of the contact, ha[d] committed or was committing a crime[.]" The juvenile court weighed the credibility of the witnesses and found Alesch's timeline of events to be more credible, as "it would make little to no sense for [Alesch] to want to search [Gem] at the end of the encounter[.]"

The juvenile court also found that Gem voluntarily consented to the search of his person. The court noted that while the search likely met the requirements under the plain-feel doctrine, it was satisfied that Gem's consent was made freely and voluntarily and there was no need to further analyze the plain-feel exception to the search warrant requirement.

The juvenile court also found that Gem's Fifth Amendment privilege against compelled self-incrimination had not been violated by Alesch's failure to provide Gem with *Miranda* warnings. The court noted that Gem was not in custody nor deprived of his freedom of action when asked whether the object in his pocket was a drug pipe, and therefore the question was permissible and Gem's response in the affirmative was not subject to suppression.

After previously overruling Gem's motion to suppress, a formal hearing was held on the State's petition on June 17, 2019. The State introduced exhibit 1, a stipulation that Alesch would have testified consistent with his testimony at the suppression hearing had he been called, as well as a stipulation to Gem's birthdate and that the events giving rise to the petition took place in Lancaster County, Nebraska. The State also introduced exhibit 2, the pipe that was recovered from the search of Gem.

The court found that the State had met its burden of proof regarding the allegations in its petition, that Gem had possessed drug paraphernalia in violation of § 28-441, and adjudicated Gem pursuant to § 43-247(1). This appeal followed.

## ASSIGNMENTS OF ERROR

Gem asserts that the juvenile court erred in overruling his motion to suppress evidence and statements. Specifically, Gem assigns, consolidated and restated, that (1) law enforcement officials conducted an unreasonable search and seizure in violation of his Fourth Amendment rights; (2) even if Gem consented to the search, the evidence and statements solicited are "fruit of the poisonous tree" and should be suppressed; and (3) Gem's statements to law enforcement officials were obtained in violation of *Miranda* and his Fifth Amendment privilege against compelled self-incrimination.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Giavonni P.*, 304 Neb. 580, 935 N.W.2d 631 (2019). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Jordan B.*, 300 Neb. 355, 913 N.W.2d 477 (2018).

A trial court's ruling on a motion to suppress based on the Fourth Amendment, apart from determination of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is upheld on appeal unless its findings of fact are clearly erroneous. *In re Interest of Ashley W.*, 284 Neb. 424, 821 N.W.2d 706 (2012). The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *Id*.

In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, including claims that it was procured in violation of the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. With regard to historical facts, we review the trial court's findings for clear error. Whether those facts suffice to meet the constitutional standards, however, is a question of law, which we review independently of the trial court's determination. *In re Interest of Miah S.*, 290 Neb. 607, 861 N.W.2d 406 (2015).

## ANALYSIS

Gem generally assigns that the juvenile court erred in overruling his motion to suppress evidence and statements. He contends that his Fourth Amendment right against unreasonable searches and seizures, and Fifth Amendment privilege against compelled self-incrimination, were violated and the evidence leading to his adjudication therefore should have been suppressed. We disagree.

### FOURTH AMENDMENT SEARCH AND SEIZURE

Gem first argues that the juvenile court should have found that the contact by law enforcement exceeded the permissible scope and duration of a *Terry* stop and, therefore, amounted to an unlawful arrest unsupported by probable cause. In the alternative, Gem argues that even if law enforcement's contact with him did not amount to a custodial arrest, the requirements of an

investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), were not met. For the reasons set forth below, we find that the conduct of law enforcement in this case did not violate Gem's Fourth Amendment rights.

The Fourth Amendment of the U.S. Constitution and Article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013); U.S. Const. Amend. IV; Neb. Const. art. I, sec. 7. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). The first tier involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. *Id*. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. *Id*.

The second category, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio, supra*, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *State v. Shiffermiller, supra*. This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. *State v. Shiffermiller, supra*.

The third type of encounter, an arrest, is characterized by a highly intrusive or lengthy search or detention. *Id*. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime. *State v. Shiffermiller, supra*.

In this case, the juvenile court found, and we agree, that the encounter between Gem and law enforcement officers falls under the second category, the investigatory stop. Gem disputes this characterization, claiming that the scope and duration of his encounter amounted to an unlawful arrest unsupported by probable cause. We disagree.

We acknowledge that the Nebraska Supreme Court has expressed "there is often a gray area between investigatory detentions and arrests." *State v. Shiffermiller*, 302 Neb. at 255, 922 N.W.2d at 773. The Supreme Court stated, in *State v. Wells*, 290 Neb. 186, 197, 859 N.W.2d 316, 327 (2015) (quoting *United States v. Jones*, 759 F.2d 633 (8th Cir. 1985)), that whether a detention is reasonable under the circumstances depends on a multitude of factors including:

> "'[T]he number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the

persons under observation, and the need for immediate action by officers and lack of opportunity for them to have made the stop in less threatening circumstances.'"

In this case, it is uncontroverted that Alesch responded to a dispatch call for a possible burglary in-progress within minutes of the call. The reporting party heard scraping at their door, and damage to the door was discovered. The limited information within the initial dispatch call did not indicate one way or another whether the suspect was armed and dangerous. Upon arrival at the apartment complex from which the report was made, Alesch noticed only one individual in the nearby vicinity, later identified as Gem, who also matched the description of wearing a "gray hoodie or sweatshirt" given by the reporting party. Approximately two or three officers arrived, in marked police cruisers, shortly after Alesch. However, Alesch was the only one to make direct contact with Gem while the other officers investigated the possible burglary. Alesch testified, and the juvenile court found credible, that he conducted a brief pat-down search within minutes of first making contact with Gem in order to determine whether Gem had any weapons on his person. During the pat-down, Alesch felt a hard object that he determined, from his 23 years of experience with the LPD, likely to be a drug pipe.

Based on these facts, and giving the appropriate weight to the fact that the juvenile court observed the witnesses and accepted Alesch's version of the facts over Gem's, we find that Alesch's pat-down search was a brief, nonintrusive investigatory stop under *Terry* and did not amount to a full custodial arrest requiring probable cause.

As previously mentioned, an investigatory stop "requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime." *State v. Shiffermiller*, 302 Neb. 245, 254, 922 N.W.2d 763, 773 (2019). "When conducting an investigatory stop, an officer must employ '"the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."'" *State v. Wells*, 290 Neb. at 195, 859 N.W.2d at 326 (quoting *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).

In this case, Alesch responded to a possible burglary in-progress call within minutes. Upon arrival at the scene, he noticed Gem, who matched the description given by the reporting party, as the only person within the vicinity. Gem was walking approximately 75 yards north of the apartment complex where the call had been made. Alesch stopped Gem, when he was still suspected of the possible burglary, and conducted a pat-down search within "the first few minutes" of making contact to ensure Gem did not have any weapons on his person. During the pat-down, Alesch located a "hard object" that, based on his experience, he determined was likely a drug pipe. Based on these facts, and the uncertainty of whether Gem was armed and dangerous, we find that Alesch's conduct in performing the investigatory stop, and subsequent search for officer safety, was reasonable in both scope and duration and did not exceed the bounds of the Fourth Amendment.

The juvenile court also found, and Gem argues that such finding was in error, that Gem voluntarily consented to the search of his person when asked by Alesch whether he could perform the pat-down. However, we need not address the issue of consent because we have already determined that Alesch's conduct was reasonable under the progeny of *Terry v. Ohio*, 392 U. S. 1,

88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) and the Fourth Amendment, irrespective of whether consent was given. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019).

FRUIT OF POISONOUS TREE DOCTRINE

Gem next argues that even if we were to find that the search by Alesch was consensual, the physical evidence and statements should nevertheless be suppressed as "fruit of the poisonous tree." However, this argument is wholly contingent on a finding that Gem's Fourth Amendment rights were violated. The "fruit of the poisonous tree" doctrine provides that "[e]vidence obtained as the direct or indirect 'fruit' of an *illegal* search or seizure, 'the poisonous tree,' is inadmissible in a state prosecution and must be excluded." *In re Interest of Ashley W.*, 284 Neb. 424, 440, 821 N.W.2d 706, 720 (2012) (emphasis supplied). We have already determined that the conduct of law enforcement in this case was reasonable as a lawful *Terry* stop, and that Gem's Fourth Amendment rights were not violated. Because there was no "poisonous tree," it follows that there is no tainted fruit to exclude. This argument fails.

FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION

Gem's final assignment of error is that certain statements he made in the presence of law enforcement should be excluded because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and his Fifth Amendment privilege against self-incrimination. We disagree.

In *Miranda v. Arizona, supra*, the U.S. Supreme Court set forth certain procedural safeguards "to protect individuals from the 'inherently compelling pressures' of custodial interrogation." *State v. Rogers*, 277 Neb. 37, 49, 760 N.W.2d 35, 49 (2009) (quoting *Miranda v. Arizona, supra*). These warnings include the right to remain silent and to have an attorney present at questioning. *State v. Rogers, supra*. At the core of *Miranda* is protection of the Fifth Amendment privilege against self-incrimination. See *Miranda v. Arizona*, 384 U.S. at 444 ("the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination").

The safeguards provided by *Miranda* come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). *Miranda* warnings are required only when there has been such a restriction on one's freedom as to render one "in custody." *Id*. A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *Id*.

It is undisputed that Alesch never gave Gem *Miranda* warnings at any point during their interaction. It is also undisputed that upon conducting the pat-down, and locating the "hard object" in Gem's pocket, Alesch asked Gem whether the item was a "drug pipe" or a "smoking pipe." "Interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police, other than those normally attendant to arrest and custody, that the

police should know are reasonably likely to elicit an incriminating response from the suspect. *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010). Surely Alesch's question to Gem whether the object in his pocket was a "drug pipe" or "smoking pipe" falls under this definition.

Nevertheless, in this case, the juvenile court determined that Gem was not in custody when questioned and was not otherwise deprived of his freedom of action in any significant way. We agree. The record indicates that the conversation between Gem and Alesch took place in the open in the parking lot of an apartment complex. Gem was not placed in handcuffs or otherwise restricted in movement. Alesch was also the only law enforcement officer to make direct contact with Gem. While there is conflicting testimony regarding whether Gem indicated that he was running late to catch a bus to class, and whether he asked to leave, the juvenile court found credible Alesch's testimony that Gem did not request to leave and voluntarily responded to Alesch's questioning. When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Jordan B.*, 300 Neb. 355, 913 N.W.2d 477 (2018). Because we agree that Gem was not subject to the restraint of freedom ordinarily associated with a traditional arrest, we find that Gem's Fifth Amendment privilege against self-incrimination was not violated, and this argument fails.

## CONCLUSION

We find that the juvenile court did not err in overruling Gem's motion to suppress evidence and statements. Accordingly, the judgment of the juvenile court adjudicating Gem pursuant to § 43-247(1) is affirmed.

AFFIRMED.